FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO** 2020 NOV 12  AM 9: 46

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

| | | |
|---|---|---|
| **INTERSTATE MEDICAL** | § | |
| **LICENSURE COMPACT** | § | |
| **COMMISSION** | § | |
| *Plaintiff* | § | **Civil Action no.** |
| | § | **1:20-cv-02942-CMA-NYW** |
| **vs.** | § | |
| | § | |
| | § | |
| **WANDA BOWLING** | § | **Jury Trial Requested** |
| *Defendant* | § | |

**DEFENDANT WANDA BOWLING'S COUNTERCLAIM AGAINST**
**THE INTERSTATE MEDICAL LICENSURE COMPACT COMMISSION**

Wanda Bowling ("Defendant" and "Counter Claimant") files this Counterclaim against

the Plaintiff, Interstate Medical Licensure Compact Commission ("IMLCC"), pursuant to FED.

R. CIV. P. 13 arising from the subject matter of the Plaintiffs original Complaint against Counter

Claimant.

## PARTIES

1.  Plaintiff: Interstate Medical Licensure Compact Commission at 5401 South Prince

    Street, #111, Littleton, CO  80120.

2.  Defendant and now Counter Claimant: Wanda Bowling at 3948 Legacy Dr., #106

    Plano, Texas  75023.

Defendants Counterclaim                                    Page 1 of 30

## JURISDICTON

Federal Court personal jurisdiction is proper as Plaintiff is located within the region for which the U.S. Colorado District Court is conservator..  The nature of this case arises out of a pending lawsuit filed into this court by the Plaintiff against Defendant, now Counter Claimant.

Subject matter jurisdiction for this civil counter action is pursuant to 28 U.S.C. §§ 1332 Diversity.  Damages far exceed $75,000.00 and are detailed in this Counterclaim in the Relief Requested section.

## NATURE OF CASE

This case matured to a level of significant harassment toward Counter Claimant by the Interstate Medical Licensure Compact Commission ("IMLCC" hereafter).  The IMLCC's Executive Director, Marschall·Smith, filed a frivolous and nonsensical lawsuit against Defendant, now Counter Claimant, Ms. Wanda Bowling("Ms. Bowling" hereafter) to publicly throw blame toward Ms. Bowling for his bad decisions which caused the IMLCC hardships.  The damage to Ms. Bowling is ongoing and must cease.

Defendants countersuit is based on the following offenses:

- Misclassification of employment

- Wrongful Termination for refusing to perform an illegal act

- Wrongful Termination in furtherance of lawful act(False Claims and Whistleblower protection)

- Libel/(future cause Slander)

- Intentional infliction of emotional distress

Defendants Counterclaim                                   Page **2** of **30**

## FACTUAL BACKGROUND

1.      In August of 2016 Wanda Bowling was offered a Contract-to-Permanent employment position with the IMLCC.  The contract contained a "right-to-hire" clause, meaning, if the IMLCC felt Ms. Bowling's performance was a good fit for the IMLCC, they had the right to hire Ms. Bowling as an employee with no finder's fee.

2.      At the time Bowling was contracted, the IMLCC was not in business generating income.  HRSA(Federal agency: Health Resource and Services Administration) funded the initiation of the IMLCC and has continued since then to issue GRANT money to support the IMLCC's operations.   Per the contract, Ms. Bowling was to serve as a Project Manager/Business Analyst.  During the contract term 9/2017 – 2/2017, Ms. Bowling's duties per the contract were the "*development and deployment for an information system for licensure through the IMLCC*". In essence, Ms. Bowling's job was to create and implement the automation to push the IMLCC into production.  Ms. Bowling accomplished this job and the system was production ready in January 2017 as required by HRSA.

3.      **SIDE NOTE: For the following four(4) years the IMLCC continually promised Ms. Bowling employment, but instead offered new contracts in piecemeal to continue working for the IMLCC with no benefits.**

4.      In April of 2017 the IMLCC went into production and has been operating well since.  See Press Release Exhibit A for the first license issued.

5.      Ms. Bowling was thrilled with the opportunity to serve at the IMLCC and found joy in her service.  This attitude never ebbed, even to the day Ms. Bowling was terminated.

6.      Very soon after the IMLCC went into production, the IMLCC's growth accelerated at such a speed Ms. Bowling's work week expanded over a 7 day work week,

Defendants Counterclaim                                                                     Page **3** of **30**

morning, noon, and night.  Physicians and licensing staff called at all hours, all time

zones.  For most of the time Ms. Bowling opted to only bill the IMLCC a straight 40

hours a week as an offering of good will since this was a public service.

7.      At one point, the IMLCC offered Ms. Bowling the opportunity to serve as

their Executive Director, another contract position, but Ms. Bowling declined knowing

her skillset better served the IMLCC's increasing operational requirements.

8.      Eventually, an Executive Director, Marschall Smith, was hired in October

2017.

9.      Mr. Smith selected and hired a local Audit/CPA firm to execute the

IMLCC's accounting and produce financials.

10.     The IMLCC looked to Ms. Bowling to fulfill many roles since she was the

only resource in operations.  Ms. Bowling's responsibilities expanded to a wide variety of

tasks detailed below:

- customer service(phone and email inquiries)
- financial analysis and state liability(reimbursement)
- onboarding for all State Boards
- provide Training to licensing staff
- technical analysis/diagnosing inconsistencies and forming solutions
- database administrator and data mining
- moderated the licensing staff conferences and meetings
- quality assurance: tester for all apps before implementation
- product procurement/demos/RFP process
- vendor procurement and vendor management
- support and train the Administrative staff in their jobs(Marschall Smiths admins)
- support the licensing staff(44 medical boards) in their daily questions/problems
- product support for all products
- event planner:  Licensing Summit (100+ people)

Obviously, most the above tasks are not of a Project Manager or Business Analyst

for which Ms. Bowling was contracted.

Defendants Counterclaim                                         Page **4** of **30**

11.    The Personnel Committee charged Mr. Smith to assume several of the above tasks from Ms. Bowling's large plate of responsibility, but he refused.

12.    At about 1.5 years into his 2 year contract, Mr. Smith was told by the IMLCC Executive Committee that his(Mr. Smiths) contract would not be renewed.  Mr. Smith's tension toward Ms. Bowling grew being that part of his pending dismissal was due to forcing Bowling to execute his responsibilities.

13.    Mr. Smith began to defame Ms. Bowling.

14.    Mr. Smith controlled where expenditures and credits were posted.  He began sabotaging Ms. Bowling's budget making false claims of Bowling not meeting her budget.  Mr. Smith accused Ms. Bowling of asking for too much budget, then was accused of spending over budget, etc.  This caused Ms. Bowling an incredible amount of financial work to prove Mr. Smith had misapplied expenses and funds in Ms. Bowling's budget.

15.    At some point around March of 2019 the current Chair of the IMLCC, Ken Simon, an individual who also served as a board member for the FSMB(Federation of State Medical Boards), dictated an audit of Ms. Bowling's conservatorship over operations and technology.  An audit over the IMLCC technical architecture, security, and future plans had already taken place six month earlier by an another external company.  Regardless, Simons pushed for another audit which did not make sense.

16.    Without an IMLCC vote, Mr. Simon unilaterally selected a resource from the FSMB to execute the "audit".

17.    Ms. Bowling cooperated and went onsite to the FSMB to assist their resource in launching an audit.  The resource was a technology developer.  While onsite at the FSMB Ms. Bowling met with the FSMB's technology executive management.  Ms. Bowling was presented

Defendants Counterclaim                                          Page **5** of **30**

with the "advice" that the IMLCC should use the FSMB database to conduct certain business validations. This would entail a technology bridge between the IMLCC systems and the FSMB systems. This would also require the exchange of IMLCC data to the FSMB's system in order to obtain FSMB sourced validations in return. The concept did not make sense, nor did it serve any benefit for the IMLCC. More alarming about this request was the requirement to exchange data. The dissemination of IMLCC physician and medical licensing data is highly illegal. This information is protected and belongs to the states. All states have laws prohibiting the dissemination of this data and it is a criminal offense in most states. The IMLCC also has aligning statutes forbidding dissemination of data: Chapter 2 Administrative Rule on Information Practices Section 2.5 where it states:

> "The Interstate Commission is prohibited by the Compact from providing any and all licensure, complaint, disciplinary and investigatory information maintained in the coordinated information system, including a core data set, to any individual, entity or organization other than a member state board."

18.     Ms. Bowling listened to FSMB's proposal, but did not act.

19.     As the audit proceeded, the FSMB's developer continued to pressure Ms. Bowling into conceding to the IMLCC integration of data with the FSMB's database. None of the justifications made sense and Ms. Bowling politely disagreed.

20.     Eventually, the FSMB resource delivered a written assessment of the audit over IMLCC systems.   And once again, the FSMB resource advised the IMLCC the should "leverage" the FSMB systems to obtain primary source data. This was the same

Defendants Counterclaim                                         Page **6** of **30**

concept presented to Ms. Bowling where the illegal exchange of data was a requirement. The Technology Committee(Commissioners) responded to the FSMB's assessment with corrections and objections to the request for "leveraging" the FSMBs data.. The only outstanding advice from the FSMB not addressed was the recommendation that the IMLCC reserve budgeted funds to get Ms. Bowling support staff to help with her mounting tasks.

21.     In the summer of 2019, Ms. Bowling realized Mr. Smith had been mixing cash accounting with accrual accounting to attain his desired numbers to sabotage Bowling's actuals to budget. He was subsequently called on it by other Commissioners. Ms. Bowling and other commissioners requested an audit of the IMLCC "financials". No one had ever seen an accounting ledger or trial balance of any kind. Nothing became of the request. As concerns grew about Mr. Smith, Ms. Bowling heard rhetoric that both Mr. Smith and Mr. Simon were defaming her. Ken Simon(FSMB Board Member) openly mistreated Ms. Bowling and defamed her in public meetings.

22.     Following this meeting, Mr. Smith was offered a short term employment contract to continue with the IMLCC as their Executive Director. Questions were raised as to who made the decision.

23.     The IMLCC, unknown who, gave Mr. Smith permission to unilaterally select and hire a "bookkeeper" in addition to the CPA/Audit firm to do the financials. Additionally, Mr. Smith hired two administrative assistants.

24.     Mr. Smith forced Ms. Bowling to train his administrative assistants which required her to travel to Colorado and further be the support of their ongoing needs.

25.     Thereafter, Ms. Bowling continued to receive complaints from vendors for non-payment. Licensing boards(who were supported by Ms. Bowling) complained of faulty

Defendants Counterclaim                                              Page **7** of **30**

reimbursements. Mr. Smith's accounting spreadsheet of Bowling's actuals to budget was flawed with misapplications. Ms. Bowling's concerns escalated when some of Mr. Smith's misapplications included <u>missing credits.</u>

26.     Ms. Bowling requested a meeting with Mr. Smith and several commissioners to explore implementing proper business financial controls to deter any future questions of misappropriations. Ms. Bowling wrote up suggestions, but nothing was ever implemented.

27.     The IMLCC had been in business for two and a half years. It appeared we were paying an audit/CPA firm and a bookkeeper, but no monthly financials or ledgers were being produced.

28.     In November 2019 the IMLCC conducted their annual meeting. Ken Simon's term to serve as Chair ended. With that said, Mr. Simon embarked on hand picking his replacement as Chair. Mr. Simon selected Tim Terranova to continue in this place.

29.     Tim Terranova joined into the effort making up defaming stories to further damage Ms. Bowling's reputation among new member boards and those outside of Ms. Bowling's direct circle of commissioner support.

30.     Mr. Terranova was directly involved in several of Ms. Bowling's projects as a team member and conversed outside of project meetings with other team members fostering dissention and adversity against Ms. Bowling. Ms. Bowling directly caught it several times because member boards would share their conversations with Mr. Terranova to Ms. Bowling. It appeared to be simple immaturity, but as Terranova's slander progressed, Ms. Bowling translated these problems as Mr. Terranova carrying on

Defendants Counterclaim                                    Page **8** of **30**

Ken Simon's smear campaign to ultimately remove Bowling who protected the IMLCC's data from the FSMB.

31.     Mr. Smith actively attempted to force the technical integration between the IMLCC and the FSMB. At one point he addressed the "project" in an Executive Committee meeting. He presented it as an upcoming project. It appeared to be a directive. Several Executive members spoke up with their objections.

32.     Mr. Smith, on several occasions, attempted to get Ms. Bowling to execute the project without the commission's knowledge. Ms. Bowling was the only resource who could execute the project as she was the only one who knew what systems could provide the data and how to do it quickly without too much cost. Ms. Bowling listened to Mr. Smith, but did not act on the directive. Ms. Bowling's last statement to Mr. Smith regarding the unlawful integration was "Yes, it can be done, happy to do it as long as the full commission votes affirmatively".

33.     Mr. Smith caused other strange hardships for Ms. Bowling. Mr. Smith directed Ms. Bowling to force State Board licensing staff to do tasks for him. The licensing staff does not work for Ms. Bowling, nor Mr. Smith. It just so happens that the state licensing staff volunteered and participated in tasks to help Ms. Bowling in projects, but it was their decision to volunteer. Ms. Bowling had no authority to make any of these state members work for Mr. Smith. Ms. Bowling requested Mr. Smith make his requests directly to the licensing staff without Ms. Bowling being in between.

34.     It was clear Mr. Smith coveted Ms. Bowling's relationship and trust by the members boards. Further, Ms. Bowling did have total control over operations and technology, not because she wanted it, but because the IMLCC leaned heavily on Ms. Bowling and did not provide adequate funds to get other staff to help Ms. Bowling. In that regard, Ms. Bowling tried

—

to reason with Mr. Smith for more budget to get help, but was denied.

35.     Mr. Smith continued to misappropriate financial entries to sabotage Ms. Bowling's budget to look as though Ms. Bowling poorly executed her job and was not a good steward of IMLCC funds.

36.     Still, halfway through 2020, the IMLCC has been in business for over 3 years, and not one monthly financial had been produced(P&L, Trial Balance, Balance Sheet, etc.).

37.     It appeared Mr. Smith had a growing concern for a particular budgeted item for 2020-2021 that Ms. Bowling proposed and received approval.  The project entailed the implementation of a Financial Accounting system:

> "Accounting Tool"
> General Ledger
> Accounts Payable
> Accounts Receivable
> Core reports(P&L, Balance Sheet, Agings)

Mr. Smith actively removed this item off of the budget of Ms. Bowling's projects 2020.  Ms. Bowling caught the omittance and requested he replace it back for this year's project as it had already been approved by the IMLCC Committee to move forward.  This particular project would have required Ms. Bowling to audit the historical financial information to determine how to technically metabolize it in the system, splice it for subledgers, and set it up for reporting.

38.     In June of 2020, Ms. Bowling began the business analysis and planning of the IMLCC's new financial accounting tool.  This was the largest project on the technical roadmap for the 2020-2021 fiscal year.

39.     At the same time,  Bowling's contract was expiring on 6/30/2020.  An

employment attorney some months earlier had warned the IMLCC that Bowling had been misclassified as an independent contractor and the commission needed to make her an employee offering benefits.   Being in charge of Bowling's budget, Mr. Smith offered Ms. Bowling a two month contract only.  On June 16th 2020 the Personnel Committee directly told Ms. Bowling and Mr. Smith they were working on getting Ms. Bowling some other kind of solution for employment and would have that solution shortly.

40.      On June 20th, 2020, a Saturday, Ms. Bowling received several confusing phone calls from IMLCC Commissioners expressing their surprise and disappointment over Ms. Bowling leaving the IMLCC.  Ms. Bowling had no idea of what they were talking about. Unbeknownst to Ms. Bowling, Marschall Smith, had sent out an email to all Commissioners(31 states and 44 boards) without copying Ms. Bowling, stating that Ms. Bowling had "willfully declined to renew her contract" and her last day will be June 30th.  The email was defaming and untrue.

41.      Mr. Smith deliberately manufactured a story making it look like it was Ms. Bowling's idea to leave.  Ms. Bowling was well liked by most of the state staff and commissioners.  Mr. Smith was not well liked and would have been questioned if he terminated Ms. Bowling.  Mr. Smith's fabrication to the Commissioners intentionally mitigated any lash back at him.  However, it made Ms. Bowling look reckless and untrustworthy because of its abruptness.

42.      The following Monday, June 22, Ms. Bowling received an email from Marschall Smith declaring to Ms. Bowling, that she was 'willful' in not signing a new contract"(his unapproved two month offering), and her last day will be June 30th, 2020.  In essence Marschall Smith terminated Ms. Bowling under defaming and false pretenses.

Defendants Counterclaim                                    Page **11** of **30**

43.     Tim Terranova joined into the widespread communication and communicated a follow up response·to the entire commission(31 states and 44 boards) stating that Ms. Bowling had been "disgruntled" insinuating falsely that Ms. Bowling had refused to renew because she was unhappy.   He further falsely articulated Compact Law and told the entire Commission they were not allowed to talk to each other, nor were they allowed to call Ms. Bowling in case they had questions.

44.     Regardless of the malicious attack on Ms. Bowling, she was indeed at the mercy of  complying to the dismissal as an "Independent Contractor" although misclassified as an independent contractor.

45.     Ms. Bowling decommissioned herself from the IMLCC by June 30 and served no more.

46.     Mr. Smith had Ms. Bowling's replacement in place by July 15th, two weeks after Ms. Bowling's termination.  He apparently unilaterally selected this resource.

47.     It would be extremely difficult for any individual to pick up Ms. Bowling's duties as she had many responsibilities and was in the middle of several projects that took months of research and planning.  The lack of knowledge would assuredly cause hardships.

48.     Bowling is not intimate with all of the details, but word circled back to Bowling that the IMLCC was experiencing the expected hardships.  Within a few weeks both Mr. Smith and Richard Masters(FSMB hired attorney) wrote threatening letters to Bowling redirecting blame of their hardships and falsely claiming Bowling was in breach of contract for a multitude of nonsensical reasons.  Ms. Bowling responded by disabling notifications from her work email address as she was already wounded by the IMLCC's

overuse, abuse, and the abrupt termination.  Apparently, no one understood that an independent contractor has no obligation to do any more for the IMLCC.

49.     After three months passed, on October 3, 2020, Ms. Bowling received notification that the IMLCC had filed a lawsuit against Ms. Bowling.  After reading the nonsensical Complaint, it became apparent that a few rogue leaders of the IMLCC did not fair well after Ms. Bowling's termination.  This is a fictitious lawsuit filed by the Mr. Smith and Mr. Terranova attacking Ms. Bowling to excuse their reckless decisions in their treatment of Ms. Bowling.

50.     Ms. Bowling responded to the court with a Motion to Dismiss and a letter to Mr. Smith demanding he dismiss the lawsuit, consider a settlement, or face a countersuit asking for a settlement for the Misclassification, the Wrongful Termination encompassing two fronts(refusal to execute an illegal act and misappropriation of Federal Funds), Libel, Intentional infliction of emotional distress, the frivolous litigation, defamation, and the intentional perjury in the complaint.

51.     Sometime after Ms. Bowling's letter to Mr. Smith, Mr. Terranova sent out another letter to the entire Commission(31 states and 44 boards) falsely stating Ms. Bowling refused to renew her contract, and falsely claimed Ms. Bowling refused to return "personally identifiable information".  This is ridiculous if you read the IMLCC complaint.  The lawsuit and Mr. Terranova's letter express different claims.

52.     Instead of a voluntary dismissal from the IMLCC, Ms. Bowling received a counter response to Ms. Bowling's Motion to Dismiss.  It is clear the IMLCC is proceeding with their frivolous lawsuit.

53.     This Counterclaim is the result of the IMLCC rogue leadership's relentless, ongoing, attacks on Ms. Bowling.

Defendants Counterclaim                                             Page **13** of **30**

## COMPLAINT

After four years of devotion Ms. Bowling was abruptly terminated and immediately defamed to a widespread of endeared Commissioners.

Ms. Bowling had repetitively barred the illegal dissemination of state information, actively protected the IMLCC from financial misappropriations, and knew the players who organized these unlawful activities. The smear campaigns were designed to build a foundation to their reckless termination of Bowling. Regardless of the abrupt dismissal over these adverse conspiracies, Ms. Bowling chose not to be litigious and move forward.

However, with the ongoing harassment of the IMLCC's lawsuit against Ms. Bowling by the same corrupt players, Ms. Bowling has no choice, but to expose these activities and request restoration. It is time to cease the defamation and damage toward Counter Claimant.

Ms. Bowling files this counter claim against the IMLCC and, in support thereof, respectfully shows the Court as follows:

## COUNT I
### (Misclassification)

The IMLCC has already been warned by an employment attorney as recently as March of 2020 that they are violating state and federal labor laws by misclassifying Ms. Bowling's employment. The attorney directly met with to the IMLCC's Personnel Committee regarding the current misclassification issue and explained the risk of expense if the IMLCC chose to continue to violate State and Federal labor laws. There is no question that the IMLCC knew of the misclassification of Ms. Bowling's services, but thereafter chose to allow rogue leaders to only

offer Bowling another contract with no benefits upon renewal instead of employment.  The

Personnel Committee had a chance to correct this violation two weeks after Bowling's

termination, but chose to do nothing.

Ms. Bowling operated for four years as an "Arm to the Company" with no benefits.

It is important to note that Ms. Bowling was a trusted participant fully integrated into

IMLCC business from the very beginning.  Please see **Exhibit A** for the IMLCC's first "Press

Release" in April of 2017 where the IMLCC are proudly announcing the issuance of the first

Interstate Medical license.  https://www.imlcc.org/news/press-releases-and-publications/ under

the link "Publications" in the subsequent link titled Interstate Medical Licensure Compact

Commission Issues First License – April 21, 2017.

The header of the press release begins with:

> *Contact: Wanda Bowling*
> *Program Specialist*
> *Interstate Medical Licensure Compact Commission*
> *(770) 335-2539*
> *inquiry@imlcc.net*

The footer of the press release ends with:

> *For more information, contact Wanda Bowling at (770) 335-2539 or via email at*
> *inquiry@imlcc.net or visit the IMLCC website at imlcc.org.*

Needless to say, by April 2017, the IMLCC had trusted Ms. Bowling with an

insurmountable of critical responsibility and depended on Bowling to run their operations.

The above (770) phone number was Ms. Bowling's personal cell number for which now

also served as the IMLCC's customer care, inquiry, everything contact number to serve the

IMLCC.  The inquiry@imlcc.net served as the same for which Ms. Bowling monitored and

answered all inquiries(physicians, state licensing Board staff, legislators, locums, hospitals,

Defendants Counterclaim                                        Page **15** of **30**

commissioners, the press).

Ms. Bowling's integration with the IMLCC makes her an employee clearly.

As for Ms. Bowling's status in Texas, she is under the conservatorship of the Texas labor laws as well as the US Department of Labor.  The Texas Workforce Commission put together an EMPLOYMENT STATUS COMPARATIVE APPROACH with 20 scenarios discriminating Employees from Independent Contractors.  Ms. Bowling clearly fits into 18 of the Employee scenarios.  The remaining 2 scenarios are relative to "expenses" which may have been unlawfully inflicted onto Ms. Bowling.  It was always left up to Ms. Bowling to pay for her own expenses, her own office supplies, and personal computer.  Ms. Bowling had to use her personal credit to open accounts in behalf of the IMLCC at the beginning when the IMLCC treasurer refused to supply to Bowling the IMLCC bank account info, FED ID, and a credit card to open up corporate accounts.

In lieu of filing complaints with the U.S. Department of Labor, FSLA, the Texas Department of Labor, the IRS, and ERISA for the non-payment FICA, FUTA, SUTA, Workman's Compensation, overtime, medical benefits/other, vacation/sick, and further costing the IMLCC penalties/fines/sanctions for the non-payment of such requirements and not withholding of income tax, the IMLCC can simply restore Ms. Bowling dollar for dollar for the benefits she should have reaped as an employee.   Relief is detailed at the end of this Countersuit.

## COUNT II
### (Wrongful termination for refusing to perform an illegal act)

Employee's rights to be free from discrimination and retaliation in the workplace is mostly derived from laws created by Congress at both the state and federal level.  Ms. Bowling brings her

Defendants Counterclaim                                        Page **16** of **30**

COUNT II claim under the Sabine Pilot doctrine where most of the criteria was derived from Federal law.

The Sabine Pilot exception to employment at will prohibits employers from discharging employees for refusing to perform an illegal act. "Sabine Pilot" is the abbreviated name of a case decided by the Supreme Court of Texas in 1985, *Sabine Pilot Svs. v. Hauck*, 687 S.W.2d 733 (Tex. 1985).

Ms. Bowling was never faced with a complaint about her employment with the IMLCC on any matter whether it be personality, performance, availability, quality, attitude, production of work, or any such item describing her competency on the job. No justification existed to dismiss Ms. Bowling. She was never written up or was approached with any review issues.

Ms. Bowling had been pressured, admonished, and threatened with defamation for refusing to generate/disseminate IMLCC data to the FSMB whether manually or by an automatic technical bridge under the table and without the IMLCC's commission authority. Ms. Bowling's resistance to build the illegal integration was misarticulated to others as " she refused to cooperate with directives".

Tyrant leaders endeavored to remove Ms. Bowling to allow the backdoor integration from the IMLCC to the FSMB.

It is not a secret the FSMB endeavored to obtain the IMLCC data as other Commissioners were involved in defending this integration.

In Safeshred, Inc. v. Martinez, 365 S.W.3d 655 (Tex. 2012), the Court held that an employee could recover any reasonable tort damages, including punitive damages. The Court held that punitive damages were an available remedy for an employee wrongfully discharged for refusal to commit an illegal act provided the employee could prove that the discharge involved

Defendants Counterclaim                                    Page **17** of **30**

malice. The malice involved must be "actual malice" and something more than the intentional

firing.  The firing must involve "substantial injury" and something "independent and

qualitatively different from the compensable harms associated with the cause of action." To

illustrate, the Court gave examples of this type of malice:

> • *where the employer circulates false or malicious rumors about the employee before or after the discharge or actively interferes with the employee's ability to find other employment.*

> • *The Court referred to another case where a nursing home made the employee's conduct look worse than it was before the state nursing board.*

> • *Another example is damage to the employee's reputation or future employment prospects, which is a qualitatively different injury from the firing itself, and conscious indifference to a risk of that injury.*

> • *Harassment in connection with a wrongful firing.*

Malice can be found in IMLCC emails, documents, public meetings, and defamation in

committee meetings(open to the states).  The IMLCC has acted with reckless indifference to the

state protected rights of Ms. Bowling.


## COUNT III
### (Wrongful termination for furthering of lawful acts under the False Claims Act)

The False Claims Act (FCA), 31 U.S.C. §§ 3729 – 3733.  In Section 3730(h) of the False

Claims Act, it offers relief of *"any employee who is discharged, demoted, harassed, or otherwise*

*discriminated against because of lawful acts by the employee in furtherance of an action under*

*the Act is entitled to all relief necessary to make the employee whole"*.

It is important to note that state and federal Whistleblower Protection Acts mirror each

other.   Both levels protect employees from retaliation for trying to prevent financial

misappropriation of federal funds and for exposing those unlawful acts.

Defendants Counterclaim                                                      Page **18** of **30**

Mr. Smith further had a motive to remove Ms. Bowling to cease the financial implementation project which opened the door to discover misappropriations of federal funds.

**Known facts**:

- In October of 2017 Mr. Smith was afforded an invoicing program developed to aggregate, calculate, and reimburse the state boards for licenses and application fees. The tool downloaded authentic financial data directly from the payment source system, a controlled data retrieval. Mr. Smith boldfaced delivered a false statement to the full commission in 2018 at an annual meeting stating that no such tool existed. It is unknown how much funds are lost without those downloads reporting state fund reimbursements.

- 2018 Mr. Smith was allowed to unilaterally select a CPA firm and an Audit Firm to execute the IMLCC accounting and produce financials. There are only 3 sources of data to balance and create books(Stripe, DocuSign, and the bank account) which makes the accounting simple. These firms have never produced one monthly set of financials for the IMLCC. A 2017 and 2018 annual statement was submitted several months after the end of those years, but the details/validations that support those numbers were not available.

- In May 2019 Mr. Smith unilaterally hired a bookkeeper. Ms. Bowling updated the state reimbursement tool for the bookkeeper(with the bookkeeper's participation) to begin issuing reimbursement checks to the states. To this day the tool has never been used. Mr. Smith is requiring the states to send an invoice of their calculations. There are volumes of complaints about reimbursement checks not balancing to the invoices from states.

- Checks issued to technology vendors(KTL, Savvior, Microsoft) never made it to the mailbox of the receiving vendors. This was discovered several months after the checks were issued as vendors complained to Ms. Bowling of non-payment. The bookkeeper

responded to Bowling's inquiries and believed the "checks were sent". This is symptom of many problems, but in the very least the bookkeeper was clearly not reconciling the bank account. If the bookkeeper was reconciling the bank account he would know that 16,000.00 of checks were floating out into the public and lost for months.

- Still, as of now, the bookkeeper has never issued one set of monthly financials or a ledger that balances to the source system.

- Mr. Smith continued to remove several credits($X,XXX.XX) from Ms. Bowling's actuals to budget "spreadsheet". Ms. Bowling kept telling Mr. Smith to put the credits back into her expense spreadsheet, but Mr. Smith kept removing them. Credits, a known fact, are a good way to conceal misappropriated funds by using the credits to offset unsavory "expenses" elsewhere. Some fraud is executed by creating credits on purpose(asking for refunds from vendors for services not used after payment), then use the credits to conceal/offset misused funds. Mr. Smith always had the opportunity to submit corrections, but did not.

After Ms. Bowling pushed for an audit she was terminated.

Without an audit or Ms. Bowling's financial project, any misappropriations of federal funds will definitely go undiscovered.

More disturbing, sometime in the last month, Mr. Smith claimed 3 computers went missing from the IMLCC office. He claimed it was burglary. These may be computers that would possess auditable evidence of misappropriated funds.

Those computers were used by Mr. Smith's handpicked bookkeeper, Mr. Smiths handpicked admins(customer service), and Mr. Smith himself (conservator of the bank account).

Defendants Counterclaim                              **Page 20 of 30**

To redirect their guilt elsewhere Smith/Terranova/(and whoever they influenced) filed a lawsuit of inventions against Bowling. The language below in the IMLCC lawsuit is untenable and lacks specificity. Please review what Ms. Bowling is accused of failing….

> "to return of certain deliverables, hardware, software, tools, equipment, and other materials provided for Defendant's use by the Plaintiff as well as her failure and refusal to deliver to the Plaintiff all tangible documents and materials reflecting, incorporation, or based on the Confidential Information, failure and refusal to permanently erase all of the Confidential information from Defendant's computer systems; and failure and refusal to certify in writing to the Plaintiff that Defendant has complied with the requirements of this agreement"

While the complaint isn't clear of what it is that Ms. Bowling covets that needs to be returned, isn't this "**the pot calling the kettle black**" since Mr. Smith's computers will never be returned?

Ms. Bowling's Motion to Dismiss is a must read. Bowling has no property that belongs to the IMLCC. It would be impossible.

## COUNT IV
### (Libel)

Defamation is generally defined as the invasion of a person's interest in his or her reputation and good name. Prosser & Keeton on Torts § 111, at 771 (5th ed. 1984 & Supp. 1988). Defamation claims are divided into two categories depending on how the defamatory statement was communicated: libel for written communications and slander for oral communications.

Elements of Defamation cause of action in Texas:

To prove a cause of action for defamation, a plaintiff must prove that (1) the defendant

Defendants Counterclaim                                         Page **21** of **30**

published a statement of fact, (2) the statement was defamatory, (3) the statement was false, (4) the defendant acted negligently in publishing the false and defamatory statement, and (5) the plaintiff suffered damages as a result. See Brown v. Swett & Crawford of Tex., Inc., 178 S.W.3d 373, 382 (Tex. App.-Houston [1 Dist.] 2005, no pet.) (citing WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998)); see also Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (Vernon 2005).

Ms. Bowling will address each element for one of many defaming statements as an example that all elements can be met. While it was clear Mr. Smith, Mr. Simon, and Mr. Terranova defamed Ms. Bowling with untrue information in an effort to gain false justification to remove Ms. Bowling, much of Ms. Bowling's knowledge of their slander came to her second hand. Much of the defamation at the IMLCC was indeed slander. The claim of Slander will require discovery and depositions to define the elements factually to a court of law. For that reason, Ms. Bowling will only address Libel below as the offense was public. Ms. Bowling preserves the right to add slander to her list of claims once discovery is completed.

The below described libel was widespread defamation written to 31 state governments and 44 boards damaging Ms. Bowling on multiple fronts.

The libel example below is regarding Mr. Smith's letter to the entire IMLCC Commission on that Saturday stating Ms. Bowling had refused to renew her contract and therefore her last day is June 30th. **Element 1**: Mr. Smith's statement is not a statement of opinion. It is a statement of fact, although false, but not a guess or a deduction. **Element 2**: The masses of licensing board staff knew without a doubt that Ms. Bowling loved her job, cared very much for the board members, and would bend backwards to assure the IMLCC moved forward daily without problems. Mr. Smith had motive to manipulate the widespread Board personnel to

Defendants Counterclaim                                   Page **22** of **30**

falsely think that Ms. Bowling did not care and wanted out of the IMLCC. This would make it seem that Ms. Bowling was faking her joy working with the members who were clearly shocked when they heard Mr. Smith's false statement. Some of the members were a bit distressed and felt deceived over what seemed to be Ms. Bowling's rejection of moving forward with the IMLCC(although false). Mr. Smith's defaming statement damaged the trust Ms. Bowling had built with the 31 state governments and 44 boards over many years. **Element 3:** There is a clear email chain of events regarding the renewing of Ms. Bowling's employment at the IMLCC that cannot be disputed. Mr. Smith knew that offering a 2 month contract was not a beneficial to Ms. Bowling(or lawful). This offering was made to Ms. Bowling after the Attorney communicated to the IMLCC that Ms. Bowling was misclassified as an independent contractor. There is a clear and indisputable email AND documentation that the Personnel Committee was offering a different solution for Ms. Bowling's employment. The email clearly indicated for Ms. Bowling to wait for their(IMLCC Personnel Committee's) solution. It was while waiting for their solution when Mr. Smith wrote his widespread defamation to the 31 state governments and 44 boards falsely stating that Ms. Bowling declined to renew her contract, essentially terminating her. **Element 4**: It is not disputable that Mr. Smith's email to the widespread public was not only negligent, but intentionally planned. If Ms. Bowling were to be terminated suddenly without explanation, Mr. Smith would have received lash back by the members boards. While Ms. Bowling had a good reputation with the members, Mr. Smith openly dumped his tasks onto Ms. Bowling which caused the members to be frustrated at Mr. Smith. Smith's damage was intentional to conceal his guilt. **Element 5**: Up to this very day, none of the state licensing staff or Commissioners know the truth regarding the termination of Ms. Bowling. They are left believing Ms. Bowling cannot be trusted for such an abrupt exit for which they believe is

Defendants Counterclaim                                    **Page 23 of 30**

unprofessional of Ms. Bowling. It is clear that the abrupt exit left the IMLCC in dire straights due to the fact that Ms. Bowling had so much responsibility in their operations. The sudden loss of knowledge and work would cause serious hardships. Today, there appears to be some chaos, issues with systems, and the lack of knowledge of how to use/access certain IMLCC systems. Thus, this same leadership has defamed Ms. Bowling ongoingly and falsely claimed she is the blame of their bad decision to recklessly remove Ms. Bowling. This claim of Ms. Bowling coveting "administrative rights" which, they claim is precluding the IMLCC from proceeding in business is untenable. There is no such cause for a lawsuit of "transferring rights" , nor could there be any damages. This lawsuit is frivolous, with blatant fabrications, defamation, and has harassed Bowling causing incredible stress.

   **Element 5 cont.**: Ms. Bowling has worked for government organizations several times in her career. Ms. Bowling has a very good reputation. After four years of working for this governmental instrument and adding it to her resume it would be a natural course of action to remain in government especially since much of her family were government servants. Government organizations desire the government experience. However, with the widespread state government defamation, the defamation to HRSA, and the existence of this Federal Lawsuit from this government instrument(IMLCC) filed against Ms. Bowling, it is highly unlikely that Ms. Bowling will ever be hired again to work for a government entity. It will be difficult for any organization to hire Bowling if this defamation is not reversed. No Employer would want to hire a resource who was sued by their employer and accused of taking property. This defamation has cut Ms. Bowling's market, and marketability to continue her business. This has damaged her ability to make an income to support her livelihood.

   **More libel**: Subsequent to Mr. Smith's widespread libel, Mr. Terranova followed up with

Defendants Counterclaim                                    **Page 24 of 30**

his own slander/libel and wrote the entire commission(31 states and 44 boards) stating Ms. Bowling was "disgruntled" in an attempt to further the fabrication of Ms. Bowling's willfulness to quit the IMLCC.  This is an intentional libel and not an opinion.

Thereafter, the IMLCC lawsuit ensued(3 months later).  The lawsuit is construction of lies and defamation on it's face.

Ms. Bowling responded with a Motion to Dismiss and a warning to the IMLCC tyrant leadership to voluntarily dismiss the case or face a countersuit by Ms. Bowling.  Mr. Terranova responded by again writing the entire Commission again(31 states and 44 boards) and articulated a very interesting point, although another invention.  The context of Mr. Terranova's statement should be a clear indication to the court that the lawsuit is a fiction as his letter's claims of Bowling doesn't match the claims of the lawsuit.  In Mr. Terranova writes:

> "it is important to remember that Ms. Bowling was an independent contractor, not an employee, and was offered a contract extension, which was not accepted.  Following the expiration of the contract on June 30, 2020, IMLCC staff and commissioners made several attempts to ensure that all proprietary, confidential, and/or personally identifiable information was returned or destroyed.  Following the apparent failure of those efforts, the Executive Committee voted to pursue legal action to protect and recover the confidential information."

According to this portion of the letter Mr. Terranova is again reiterating the same libel for claiming Ms. Bowling willfully declined a contract renewal.  Most importantly to note is Mr. Terranova is deceiving the Commission about the current claims of the lawsuit against Ms. Bowling.  Mr. Terranova is articulating that Ms. Bowling has "confidential proprietary information" that apparently was given to her, but now she refuses "to return" the information.  This is added libel.  No information exists that was "given" to Ms. Bowling to return, nor is Ms. Bowling failing "to return" any proprietary information(not sure what it is).  The lawsuit claims something very different from Terranova's letter, but just as invalid.  There is no mention of

Defendants Counterclaim                                              Page **25** of **30**

"transferring rights" in Mr. Terranova's letter which is a silly claim in the IMLCC lawsuit against Ms. Bowling. This cause is nonsensical. Ms. Bowling's Motion to Dismiss clarified there is no such thing as "transferring rights".

Further, if the court pretends the above letter stated a real claim, if the above was true, where is the damage?? The damage must be tied directly to the cause which does not exist. Ms. Bowling would have to use such data that would result in some sort of damage to the IMLCC in order to have a claim in the Federal court under diversity jurisdiction. The lawsuit lacks jurisdiction with this court, thus Ms. Bowling's Motion to Dismiss should be GRANTED.

The IMLCC tyrannical leadership cannot decide what their claims are against Ms. Bowling. This entire lawsuit is such a grave departure from legal reality.

The elements of libel can be met over many defaming letters and emails.

### (Intentional Infliction of Emotional Distress attached to COUNT II, III, and IV)

It is common law, state and federal, that intentional infliction of emotional distress is unlawful and millions of dollars are awarded to the most egregious offenders.

The attacks and smear campaigns showered Ms. Bowling with incredible fear and duress.

During the last year of her four year term Bowling experienced health problems. EKG testing revealed cardio malfunctions and dizzy spells were occurring daily. Bowling was medicated for anxiety and rhythm control, but eventually in 2020 underwent full cardio/biological testing.

In March of 2020 Ms. Bowling began to experience excruciating abdominal pain. Stomach lining was shredding. Ms. Bowling was in bed for several months with her computer on her lap. Ms. Bowling went through a sum of tests and imaging which lead to the requirement of

Defendants Counterclaim                                   Page **26** of **30**

an endoscopy, a COVID-19 non-approved procedure.

By the time the Endoscopy was approved for Ms. Bowling it was late July, several weeks after her dismissal from the IMLCC. Ms. Bowling's abdominal pain had subsided and the malfunctioning heart rhythms had calmed down. Ms. Bowling declined any more procedures due to costs.

October 2020, three months later, Ms. Bowling learned the IMLCC had filed a lawsuit against her. Immediately Ms. Bowling was back in bed in pain taking medication to mitigate the damaging anxiety. The surprise lawsuit against Bowling was telling. Ms. Bowling loved her job with the IMLCC and it never occurred to her that the IMLCC's harassment was the source of anxiety resulting in the health injuries. Ms. Bowling can provide the medical records(redacted).

In *Hammond v. Northland Counseling Center*, Inc., the plaintiff sought emotional distress damages as part of her FCA action. The plaintiff offered evidence that she suffered emotional distress as a result of workplace discrimination and harassment, her unexpectedly early termination, her sudden transition to another job, and the overall impact of defendant's alleged actions on her reputation, practice, and career. The court held that these allegations were sufficient to create a genuine issue of material fact regarding her entitlement to emotional distress damages under her FCA claim. *Hammond v. Northland Counseling Center, Inc.*, 218 F.3d 886, 893 (8th Cir. 2000)

In *Neal v. Honeywell*, the court held that compensation for emotional distress caused by an employer's retaliatory conduct is available under 31 U.S.C. § 3730(h) and such damages may be classified as "special damages." In awarding the plaintiff $200,000 for emotional injury, the court reasoned that $200,000 was not excessive in light of the threats of physical injury the plaintiff received. The court noted that without the threats, such an award probably would have

Defendants Counterclaim                                          Page **27** of **30**

been excessive.  Neal v. Honeywell, 191 F.3d 827, 831-32 (7th Cir. 1999) abrogated on other

grounds by Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 545 U.S.

409 (2005).

Most of the retaliatory actions articulated in this countersuit were public or documented.

Conduct causing the extreme stress were:

- having to deflect the directives to commit illegal acts that could result in criminal
  penalties
- admonished in public meetings for refusing to "cooperate"(without explanation of the
  illegal nature)
- admonished/retaliation for identifying suspicious financial misappropriations
- challenged with budget sabotage designed to damage her job performance
- defamations to the public 31 states and 44 boards and the resulting in career destruction
- experiencing damages to projects and project team members by rogue leaderships
  interference to sabotage projects
- being held responsible for leadership's bad decisions
- being abruptly terminated by leadership which inflicted hardships on to the IMLCC then
  being blamed for their hardships
- receiving a lawsuit as a Defendant for the IMLCC's bad decisions resulting in self
  inflicted hardships
- Ongoing retaliation and harassment in the IMLCC's relentless pursuit of blaming Bowling
  for their problems in her absence.

The Defamation, Sabine Pilot, and the False Claims Act give rise to a claim for

intentional infliction of emotional stress and physical injury.

Defendants Counterclaim                                        Page **28** of **30**

## **RELIEF REQUESTED**

1.  Ms. Bowling requests dollar for dollar benefits for 3 and half of the 4 years served

    misclassified as an independent contractor with no benefits: $219,008.00.

| Description of Benefit | Amount | Calculation |
|---|---|---|
| Half of FICA | $38,824.00 | 145,00 per year times 3.5 equals 507,500.00 times .0765 |
| Reimbursement of paid medical premiums | $24,684.00 | My actual: $484.00/24 months and $726.00/18 months |
| 3 weeks paid vacation/year | $29,400.00 | 420 hours |
| 10 paid sick and personal days/year | $19,600.00 | 280 hours |
| 10 paid holidays/year | $19,600.00 | 280 hours |
| Severance or unemployment 7/2020 - 12/2020 pay | $75,000.00 | six month's pay |
| 4 years of overtime unpaid(Texas law regardless of status) $35/excessover40hrs | $11,900.00 | 340 hours(billed) not including any goodwill hours |
| TOTAL BENEFITS CLAIMED | $219,008.00 | |

2.  Damages for Wrongful Termination to perform an illegal act inclusive of the intentional

    infliction of emotional distress and physical pain: $200,000.00

3.  Damages for Wrongful Termination for furthering of lawful acts under the False Claims Act

    and whistleblower protection inclusive of the intentional infliction of emotional distress and

    physical pain: $145,000.00 for double back pay of wages

4.  Damages for Libel and Slander inclusive of the intentional infliction of emotional distress

    and physical pain: $150,000.00

5.  Suspension by grace ($495,000.00) for 21 days. The IMLCC is required to settle this

    counterclaim and dismiss their frivolous lawsuit.  If the IMLCC continues this harassment

    Ms. Bowling will be forced to retain a personal injury firm to take over.  The Counter claim

    will be amended to remove any suspensions and add a request for sanctions.

### **TOTAL DAMAGES CLAIMED:  $219,008.00**

## **PRAYER**

Being litigious is never a good approach to any problems which is why Ms. Bowling went away quietly when she was abruptly terminated.  Ms. Bowling was overused, abused, threatened, ruthlessly terminated, and now the IMLCC's rogue leadership is back to inflict more damage.  The IMLCC lawsuit against Ms. Bowling is abuse of process as it was filed in bad faith and with malice.  The lawsuit's claims are is fuzzy at best and they cannot articulate how or what damage occurred(or quantified it).

This court will find the Plaintiff(IMLCC) filed a fabricated lawsuit to redirect blame on someone else for their self-inflicted damage.

The Counter Claimant prays this court find the Plaintiff(IMLCC) liable for the above defined damages to deter and penalize the IMLCC for their actions and cease any future ongoing harassment.

Respectfully submitted,

Wanda Bowling – Counter Claimant
3948 Legacy Dr., #106, MB365
Plano, Texas  75023
wb95058@yahoo.com
770-335-2539

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| **INTERSTATE MEDICAL** | § | |
| **LICENSURE COMPACT** | § | |
| **COMMISSION** | § | |
| *Plaintiff* | § | **Civil Action no.** |
| | § | **1:20-cv-02942-CMA-NYW** |
| **vs.** | § | |
| | § | |
| | § | |
| **WANDA BOWLING** | § | **Jury Trial Requested** |
| *Defendant* | | |

## CERTIFICATE OF SERVICE

I, Wanda Bowling, hereby certify that a true and correct copy of the foregoing instrument

DEFENDANT WANDA BOWLING'S COUNTERCLAIM AGAINST THE INTERSTATE

MEDICAL LICENSURE COMPACT COMMISSION has been forwarded by first class mail or

efiled to each attorney/party of record on this date 11/11/2020.

Respectfully submitted,

Wanda Bowling – Defendant
3948 Legacy Dr., #106, MB365
Plano, Texas 75023
wb95058@yahoo.com
770-335-2539

Richard L. Masters
MASTERS, MULLINS & ARRINGTON
1012 South Fourth Street
Louisville, Kentucky 40203
Telephone: 502.582.2900
Email: lawsaver@aol.com
Attorney for Plaintiff, Interstate Medical
Licensure Compact

Marschall Smith
Executive Director IMLCC
5401 South Prince Street, #111
Littleton, CO 80120
303 898-1144
imlccexecutivedirector@imlcc.net



**Interstate Medical Licensure Compact**

## For Immediate Release
April 21, 2017

**Contact:**
Wanda Bowling
Program Specialist
Interstate Medical Licensure Compact Commission
(770) 335-2539
inquiry@imlcc.net

## Interstate Medical Licensure Compact Commission Issues First License

The Interstate Medical Licensure Compact Commission is pleased to announce the issuance of the first Interstate Medical License. The application process went live on April 6, 2017, and an application was received on April 8, 2017, listing Wisconsin as the State of Principle License.  The Letter of Qualification was sent to Colorado on April 19, 2017 with the Colorado license issued on April 20, 2017.

Another application which was received on April 7, 2017 had a Letter of Qualification issued on April 20, 2017 by Wisconsin.  The applicant is still deciding which compact state in which they wish to be licensed.

For more information, contact Wanda Bowling at (770) 335-2539 or via email at inquiry@imlcc.net or visit the IMLCC website at imlcc.org.

### # #



EXHIBIT

*A*