**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-02942-CMA-NYW

INTERSTATE MEDICAL LICENSURE COMPACT COMMISSION,

     Plaintiff,

v.

WANDA BOWLING,

     Defendant.

_____

**AMENDED**[1] **RECOMMENDATION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE**

_____

Magistrate Judge Nina Y. Wang

     This matter is before the court on the following motions:

(1)    Defendant's Motion for Clarification of the Report and Recommendations Issued March 12th, 2021 ("Motion to Clarify") [#28, filed March 29, 2021];

(2)    Defendant Wanda Bowling Fed. R. Civ. P. 12(b)(1) and 12(b)(6) Motion to Dismiss ("Defendant's Motion to Dismiss") [#7, filed October 16, 2020]; and

(3)    Plaintiff's Motion to Dismiss Defendant's Counterclaim ("Plaintiff's Motion to Dismiss")[2] [#17, filed December 1, 2020]; and

_____

[1] This court issued a Recommendation and Order on March 12, 2021. [#24]. As set forth below, this court withdraws its prior Recommendation in favor of this Amended Recommendation.

[2] Plaintiff has filed both a Motion to Dismiss [#17] and a Memorandum of Law in Support of Plaintiff's Motion to Dismiss Defendant's Counterclaim [#17-1]. Although this court is aware that some courts permit or even require such practice, the general practice of this District is to have parties include their arguments and legal authority within one filing.

(4)     Plaintiff's "Motion to Strike and Dismiss as Untimely Filed 'Counterclaimant Reply to Plaintiff Motion to Dismiss'" ("Plaintiff's Motion to Strike") [#21, filed January 11, 2021].

These Motions have been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b), the Order Referring Case dated September 29, 2020 [#4], and the Memoranda dated October 20, 2020; December 4, 2020; January 11, 2021; and April 1, 2021, respectively [#8, #19, #22, #30].

Upon review of the Motions and the associated briefing [#10, #10-1, #20, #23], this court finds that oral argument will not materially assist in their resolution.  Based on the court's review of the Motions and related briefing, the entire docket, and the applicable case law, this court **ORDERS** that Defendant's Motion to Clarify is **GRANTED**; this court's March 12, 2021 Recommendation and Order is **WITHDRAWN**; and Plaintiff's Motion to Strike is **DENIED**.  This court also respectfully **RECOMMENDS** that Defendant's Motion to Dismiss be **DENIED**, and Plaintiff's Motion to Dismiss be **GRANTED IN PART and DENIED IN PART**.

## PROCEDURAL BACKGROUND

Plaintiff Interstate Medical Licensure Compact Commission ("Plaintiff" or "IMLCC") initiated this action against Defendant Wanda Bowling ("Defendant" or "Ms. Bowling") on September 29, 2020, invoking "§17 [sic] (c) of the Interstate Medical Licensure Compact (hereinafter "Compact") and its authorized rules" and contending that the "case arises under the U.S. Constitution; the Federal Declaratory Judgment Act, 28 U.S.C. §1331 [sic]; and the provisions of the foregoing interstate compact which is authorized under Art. I, §10 [sic], Cl.3 [sic] of the U. S. [sic] Constitution but for which the consent of Congress

was not required." [#1 at ¶ 1]. The IMLCC asserts two claims for relief arising from its allegations that Ms. Bowling is in material breach of her Independent Contractor Agreement that expired on June 30, 2020: (1) "Injunctive Relief Specific Performance" ("Claim I"); and (2) "Damages, Fees and Costs" ("Claim II"). *See generally* [*id.*].

Ms. Bowling, proceeding pro se,[3] moves to dismiss this action, arguing that this court lacks subject matter jurisdiction and the IMLCC has failed to state a cognizable claim pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, respectively. [#7]. In construing Ms. Bowling's Motion to Dismiss liberally as is required, this court understands Ms. Bowling to be arguing that there is no federal question presented by this action. [*Id.* at 7]. In addition, Defendant contends that there has been no showing of injury and Plaintiff does not allege sufficient facts to support the amount in controversy required to invoke the court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. [*Id.* at 8]. Finally, she argues that even if the court has subject matter jurisdiction over Plaintiff's claims, Plaintiff has failed to allege sufficient facts—even when accepted as true—to state a cognizable claim. [*Id.* at 8–9].

---

[3] Ms. Bowling proceeds pro se and thus, is entitled to a liberal construction of her papers. *Smith v. Allbaugh*, 921 F.3d 1261, 1268 (10th Cir. 2019). The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has explained that "[w]e believe that this rule means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the [party]'s failure to cite proper legal authority, [her] confusion of various legal theories, [her] poor syntax and sentence construction, or [her] unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But the court cannot and does not act as an advocate for a pro se party. *United States v. Griffith*, 928 F.3d 855, 864 n.1 (10th Cir. 2019). Nor does a party's pro se status exempt her from complying with the procedural rules that govern all civil actions filed in this District, namely, the Federal Rules of Civil Procedure and the Local Rules of Practice for the District of Colorado. *See Requena v. Robert*s, 893 F.3d 1195, 1205 (10th Cir. 2018); *Murray v. City of Tahlequah*, 312 F.3d 1196, 1199 n.2 (10th Cir. 2008).

On November 20, 2020, Ms. Bowling also filed a Counterclaim[4] against the IMLCC. [#11]. Therein, Ms. Bowling asserts the following counterclaims against the IMLCC: (1) "misclassification" ("Counterclaim I") [*id.* at 15–16]; (2) wrongful termination under Texas law ("Counterclaim II") [*id.* at 16–18]; (3) wrongful termination under the False Claims Act (or "FCA"), 31 U.S.C. §§ 3729–3733 ("Counterclaim III") [*id.* at 18–21]; (4) libel under Texas law ("Counterclaim IV") [*id.* at 21–26]; and (5) intentional infliction of emotional distress ("Counterclaim V") [*id.* at 26–28]. Plaintiff filed its Motion to Dismiss on December 1, 2020 [#17], seeking to dismiss Defendant's Counterclaim for failure to state a claim [#17-1]. Ms. Bowling responded to Plaintiff's Motion to Dismiss on December 23, 2020. [#20 ("Response to Plaintiff's Motion to Dismiss")]. Plaintiff subsequently sought to strike Ms. Bowling's Response to Plaintiff's Motion to Dismiss as untimely, improperly formatted, and non-compliant with various civil rules. [#21]. Ms. Bowling responded [#23 ("Response to Plaintiff's Motion to Strike")]. No replies were filed with respect to Plaintiff's Motion to Dismiss or Motion to Strike.

On March 12, 2021, this court issued a Recommendation and Order (or "March 12 Recommendation") on the Motions to Dismiss and Motion to Strike. [#24]. Therein, this court recommended that Ms. Bowling's Motion to Dismiss be granted and this case be dismissed for lack of subject matter jurisdiction. [*Id.*]. On the same basis, this court denied Plaintiff's Motion to Strike as moot and recommended denying Plaintiff's Motion to Dismiss as moot. [*Id.*]. The March 12 Recommendation did not independently consider whether, without original jurisdiction over the Complaint, it could or should nevertheless

---

[4] Though titled "Counterclaim," Ms. Bowling articulates five different counterclaims in her pleading. [#11]. For purposes of simplicity, the court will refer to Ms. Bowling's filing in the singular (i.e., "Counterclaim") unless it is referring to particular substantive counts.

retain jurisdiction over Ms. Bowling's Counterclaim. [*Id.*].

Ms. Bowling subsequently filed an "Objection to the Report and Recommendations Issued March 12th, 2021" [#27] and the instant Motion to Clarify [#28], wherein Ms. Bowling requests clarification with respect to whether the court—in recommending dismissal of this action—thereby recommends dismissal of her counterclaims. She further indicates that, if this court intended to dismiss her Counterclaim, her Objection articulates the basis for why this court should not dismiss her "compulsory" Counterclaim. [#27 at 2].

In light of the procedural background of this case, I first consider Ms. Bowling's Motion to Clarify before turning to the factual background of and jurisdictional issues implicated by this case. Because this court is satisfied that it has subject matter jurisdiction, I then proceed to consider the arguments asserted in Defendant's Motion to Dismiss, Plaintiff's Motion to Strike, and Plaintiff's Motion to Dismiss, in turn.

## MOTION TO CLARIFY

Ms. Bowling's Motion to Clarify seeks clarification with respect to the undersigned's recommendations to dismiss this action without prejudice for lack of subject matter jurisdiction and deny Plaintiff's Motion to Dismiss as moot. [#28 at 1]. More specifically, Ms. Bowling seeks to clarify whether the undersigned thereby also recommended dismissal of her counterclaims. [*Id.*]. She asserts that to the extent that this court recommended dismissal of her Counterclaim, she has filed an Objection. [#27, #28].

Nearly a month before asserting her counterclaims, Ms. Bowling challenged subject matter jurisdiction and specifically asserted that the IMLCC failed to claim the necessary jurisdictional amount to confer diversity jurisdiction. [#7 at 8 ("The Plaintiff has

failed to establish the amount in controversy exceeded $75,000 as required by 28 U.S.C. § 1332.")].  Because this court agreed with Ms. Bowling's jurisdictional argument and found subject matter jurisdiction lacking over Plaintiff's claims as asserted in the Complaint, it recommended granting Ms. Bowling's Motion to Dismiss and dismissing this action on jurisdictional grounds.  In doing so, this court did not address the merits of Ms. Bowling's Counterclaim or the motions related to the same. *See* [#24].  Nor did it analyze whether Ms. Bowling's Counterclaim should remain in this District, because no argument was made with respect to the retention of the Counterclaim.  Upon review of its March 12 Recommendation and the docket, this court finds additional analyses and clarification warranted with respect to (a) jurisdiction over this action; (b) the Motions to Dismiss; and (c) Plaintiff's Motion to Strike.

Accordingly, Defendant's Motion to Clarify is **GRANTED** and the undersigned's March 12 Recommendation is hereby **WITHDRAWN**.  I turn now to the factual background of this case before I consider whether this court has subject matter jurisdiction over Plaintiff's claims.

## FACTUAL BACKGROUND

### I.   Plaintiff's Complaint

The IMLCC asserts two claims for relief arising from its allegations that Ms. Bowling is in material breach of her Independent Contract Agreement that expired on June 30, 2020:  (1) "Injunctive Relief Specific Performance" ("Claim I"); and (2) "Damages, Fees and Costs" ("Claim II").  *See generally* [#1].  The IMLCC alleges the following facts in support of its claims.

On or about April 4, 2019, Ms. Bowling entered into an Independent Contractor

Agreement (or "Agreement") with the IMLCC. [#1 at ¶¶ 1, 7].  Throughout her relationship with the IMLCC, Ms. Bowling was the "Super Administrator" of the IMLCC data system and held the credentials for the same. [*Id.* at ¶ 7].  Pursuant to the Agreement, wherein Ms. Bowling and the IMLCC are defined as the "Contractor" and "Client," respectively [#1-2 at 1],

> All intellectual property and related materials (the "Intellectual Property") including any related work in progress that is developed or produced under this Agreement, will be the sole property of the Client. The use of the Intellectual Property by the Client will not be restricted in any manner.
>
> …
>
> Upon expiration or termination of this Agreement for any reason, or at any other time upon the Client's written request, Contractor shall within 5 calendar days after such expiration, termination, or request: deliver to the Client all deliverable undertaken in furtherance of Services (whether complete or incomplete) and all hardware, software, tools, equipment, or other materials provided for Contractor's use by the Client; deliver to the Client all tangible documents and materials (and any copies) containing, reflecting, incorporating, or based on the Confidential Information; permanently erase all of the Confidential Information from Contractor's computer systems; and certify in writing to the Client that Contractor has complied with the requirements of this clause.

[#1-2 at 3, 4].

Ms. Bowling's Independent Contractor Agreement expired on June 30, 2020. [#1 at ¶ 7].   In the days that followed, the IMLCC's Executive Director, Marschall Smith ("Mr. Smith") sent an email to Ms. Bowling. [*Id.*].  Therein, Mr. Smith asked that Ms. Bowling transfer the administrative rights and/or provide the passwords to the IMLCC's software and programs in order to facilitate the IMLCC's transition to her successor. [*Id.*].  The IMLCC was informed by its vendors that, without the information withheld by Ms. Bowling, it would be "unable to continue to facilitate the processing of expedited licenses as required by the IMLCC compact statute and compact rules." [*Id.*].

On July 15, 2020, the Chair of the IMLCC Technology Committee also emailed Ms. Bowling, requesting that she "transfer administrative rights . . . over to (him) . . . ." [#1 at ¶ 8].   Ms. Bowling did not respond to either email.  [*Id.* at ¶¶ 7, 8].  A final demand for this information was sent by the IMLCC via written letter on July 20, 2020. [*Id.* at ¶ 9].

This action followed.  According to the IMLCC, Ms. Bowling has "materially breached the terms and provisions of [the Agreement]," by failing and refusing to (a) "perform certain provisions of said contract relating to return of certain deliverables, hardware, software, tools, equipment, and other materials;" (b) "deliver . . . all tangible documents and materials . . . ;" (c) "permanently erase all of the Confidential information from Defendant's computer systems;" and (d) "certify in writing . . . that Defendant has complied with the requirements of this agreement as required . . . ." [#1 at ¶ 1].

## II.    Defendant's Counterclaim

Ms. Bowling asserts five counterclaims against the IMLCC, including misclassification, wrongful discharge, retaliatory discharge in violation of the False Claims Act, libel, and intentional infliction of emotional distress. The following facts are drawn from her Counterclaim and taken as true for purposes of Plaintiff's Motion to Dismiss.

In August 2016, the IMLCC offered Ms. Bowling a "Contract-to-Permanent employment position," [#11 at ¶ 1], as a Project Manager/Business Analyst tasked with creating and implementing "the automation to push the IMLCC into production," [*id.* at ¶ 2].  The August 2016 contract contained a "right-to-hire" clause: if the IMLCC was satisfied with Ms. Bowling's performance, it retained the right to hire her as an employee without a "finder's fee." [*Id.*].    Throughout her tenure with the IMLCC, Ms. Bowling was continuously promised employment and instead offered new, piecemeal contracts to

continue working with the IMLCC without employee benefits. [*Id.* at ¶ 3].  At all times, Ms. Bowling was required to pay for her own expenses, office supplies, and personal computer. [*Id.* at 16].

At the time of Ms. Bowling's initial contract, the IMLCC was not yet generating business income. [#11 at ¶ 2]. The federal Health Resource and Services Administration ("HRSA") funded the initiation of the IMLCC and continues to provide federal funds, via grants, to support the IMLCC's operations. [*Id.*].

Ms. Bowling completed development of the automation system in January 2017 and the IMLCC went into production three months later. [#11 at ¶¶ 2, 4].  The IMLCC's first press release—issued on April 21, 2017 and announcing the issuance of its first interstate medical license—listed Ms. Bowling as a contact and included her personal cell number, which became the IMLCC's "customer care, inquiry, everything contact number to serve the IMLCC." [*Id.* at 15].  Shortly thereafter, the IMLCC experienced rapid growth and Ms. Bowling's workweek expanded to a "7 day work week, morning, noon, and night." [*Id.* at ¶ 6].  "[A]s an offering of good will," however, Ms. Bowling "opted to only bill the IMLCC a straight 40 hours a week . . . since this was a public service." [*Id.*].  With its growth, the IMLCC also looked to Ms. Bowling to fulfill many roles within operations.  [*Id.* at ¶ 10].  Ms. Bowling's responsibilities expanded to include customer service; financial analysis and state liability reimbursements; technical analysis and diagnostics; database administration and data mining; quality assurance; product procurement; vendor procurement and management; product support; and event planning.  [*Id.*].  Ms. Bowling also supported and trained licensing and administrative staff [*id.*], once traveling to Colorado to train the administrative staff working for the IMLCC's Executive Director [*id.*

at ¶ 24]; moderated licensing staff conferences and meetings; and on-boarded all State Boards [*id.* at ¶ 10].

In October 2017, Mr. Smith was hired as the Executive Director of the IMLCC. [#11 at ¶ 8]. Mr. Smith was asked by the IMLCC Personnel Committee to assume some of Ms. Bowling's tasks. [*Id.* at ¶ 11]. He refused to do so. [*Id.*]. As the end of Mr. Smith's first two-year contract with the IMLCC neared, he was told by the IMLCC Executive Committee that his contract would not be renewed, in part because Mr. Smith continued to "forc[e] Bowling to execute his responsibilities." [*Id.* at ¶ 12]. This news led Mr. Smith to act increasingly hostile toward Ms. Bowling. [*Id.*]. He endeavored to "sabotag[e] Ms. Bowling's budget" by "making false claims" that she was failing to meet her budget. [*Id.* at ¶ 14].

On or about March 2019, Ken Simon ("Mr. Simon"), the Chair of the IMLCC and a board member for the Federation of State Medical Boards ("FSMB"), ordered an audit of Ms. Bowling's "conservatorship" over the IMLCC's operations and technology. [#11 at ¶ 15]. An FSMB technology developer "resource" conducted the audit. [*Id.* at ¶ 16]. Around this time, the FSMB presented Ms. Bowling with the "advice" that the IMLCC use the FSMB database to conduct certain "business validations." [*Id.*]. This proposal would require a technology bridge between the IMLCC and FSMB systems and the exchange of IMLCC and FSMB data, including IMLCC physician and medical licensing data. [*Id.*]. Physician and medical licensing data are protected information that belongs to the states: "[a]ll states have laws prohibiting the dissemination of this data," and dissemination of the same "is a criminal offense in most states." [*Id.*].

Ms. Bowling declined to act on the FSMB's proposal. [#11 at ¶ 18]. Thereafter, the

10

FSMB auditor delivered a written assessment of the IMLCC systems, proposing again that the IMLCC leverage the FSMB systems to obtain "primary source data" despite the "illegal exchange of data" this would require. [*Id.* at ¶ 20]. The IMLCC Technology Committee responded to the FSMB audit with "corrections and objections to the request" to exchange protected data. [*Id.*].

Ms. Bowling exercised "total control over operations and technology," and was the only resource capable of executing the project. [#11 at ¶¶ 32, 34]. Mr. Smith attempted to convince her to execute the data exchange without the IMLCC's knowledge. [*Id.* at ¶ 32]. Ms. Bowling declined to do so. [*Id.*]. Her last statement to Mr. Smith concerning the issue was "Yes, it can be done, happy to do it as long as the full commission votes affirmatively." [*Id.*].

Over the course of her final year with the IMLCC, Ms. Bowling began to experience a series of health complications, including arrythmia, dizzy spells, anxiety, and excruciating abdominal pain. [#11 at 26]. In summer 2019, Ms. Bowling "realized Mr. Smith had been mixing cash accounting with accrual accounting to . . . sabotage Bowling's actuals to budget," and joined IMLCC commissioners in requesting an audit of the IMLCC's financials. [*Id.* at ¶ 21]. Sometime thereafter, Mr. Smith was offered a short-term extension to his contract, otherwise set to expire in October 2019. [*Id.* at ¶ 22].

Following complaints from vendors and licensing boards about non-payment and "faulty reimbursements," respectively, [#11 at ¶ 25], and ongoing accounting "misapplications" to Ms. Bowling's actuals-to-budget spreadsheet maintained by Mr. Smith—including "missing credits" [*id.*][5]—Ms. Bowling requested a meeting with Mr.

---

[5] According to Ms. Bowling, "[c]redits . . . are a good way to conceal misappropriated

Smith and several IMLCC commissioners to "explore implementing proper business financial controls to deter any future questions of misappropriations." [*Id.* at ¶ 26].  None of the suggestions Ms. Bowling provided during that meeting was ever implemented. [*Id.*].

Ms. Bowling subsequently proposed and obtained budget approval from the IMLCC for a new 2020-2021 project: the implementation of a financial accounting system. [#11 at ¶ 37].  This project was the largest on the technical roadmap for the 2020-2021 fiscal year [*id.* at ¶ 38], and its implementation would require an audit of historical financial information to determine "how to technically metabolize the system, splice it for subledgers, and set it up for reporting," [*id.* at ¶ 37].  Mr. Smith was "motiv[ated] to remove Ms. Bowling to cease the financial implementation project" because it "opened the door to discover misappropriations of federal funds." [*Id.* at 19].  "Without an audit or Ms. Bowling's financial project, any misappropriations of federal funds" at the IMLCC "will definitely go undiscovered." [*Id.* at 20].

In June 2020, as her contract term was set to expire, Ms. Bowling began the business analysis and planning process for the financial project. [#11 at ¶¶ 38–39].  "After Ms. Bowling pushed for an audit she was terminated." [*Id.* at 20].  Specifically, around this time Mr. Smith offered Ms. Bowling a two-month contract extension, despite knowing that this offer was not "beneficial to Ms. Bowling." [*Id.* at ¶ 39].  Then, on June 16, 2020, the IMLCC Personnel Committee—which had been previously warned by "an employment attorney" that the IMLCC was "violating state and federal labor laws by misclassifying Ms.

---

funds by using the credits to offset unsavory 'expenses' elsewhere. Some fraud is executed by creating credits on purpose," such as "asking for refunds from vendors for services not used after payment," then "us[ing] the credits to conceal/offset misused funds." [#11 at 20].

Bowling's employment"—informed both Ms. Bowling and Mr. Smith that it was working toward "some other kind of solution for employment" for Ms. Bowling and "would have that solution shortly." [*Id.*].

Four days later, Ms. Bowling received several confusing phone calls from IMLCC commissioners who expressed surprise and disappointment over news that Ms. Bowling was leaving the IMLCC. [#11 at ¶ 40].  Ms. Bowling later learned that, unbeknownst to her, Mr. Smith sent out an email to the entire Commission—across 31 states and 44 boards—stating that Ms. Bowling's relationship with the IMLCC would terminate on June 30, 2020 because she had "willfully declined to renew her contract." [*Id.*].  This announcement was not true and made Ms. Bowling "look reckless and untrustworthy because of its abruptness." [*Id.* at ¶ 41].

On June 22, 2020, Mr. Smith reiterated a similar message to Ms. Bowling via email, stating that because she was "willful in not signing a new contract" despite his offered two-month extension,  her relationship with the IMLCC would terminate on June 30, 2020. [#11 at ¶ 42].  The Chair of the IMLCC later sent a follow-up email to all 31 member states and 44 member boards, wherein he described Ms. Bowling as "disgruntled," insinuated that Ms. Bowling had refused to renew her contract because she was unhappy, and misarticulated "Compact Law" by telling the Commission "they were not allowed to talk to each other, nor were they allowed to call Ms. Bowling in case they had questions." [*Id.* at ¶ 43]. Ms. Bowling alleges that Mr. Smith's efforts to terminate her relationship with the IMLCC was the result of her financial audit and refusal to implement the technology bridge.

Ultimately, Ms. Bowling "decommissioned herself from the IMLCC by June 30 and

served no more." [#11 at ¶ 45].   Ms. Bowling's abdominal pain and arrythmia subsided within weeks of leaving the IMLCC, only to return again three months later upon the IMLCC's initiation of the instant action. [*Id.* at 27].

## ANALYSIS

### I.      Defendant's Motion to Dismiss

#### A.      Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction and, as such, "are duty bound to examine facts and law in every lawsuit before them to ensure that they possess subject matter jurisdiction."  *The Wilderness Soc. v. Kane Cty., Utah*, 632 F.3d 1162, 1179 n.3 (10th Cir. 2011) (Gorsuch, J., concurring); *see also Cellport Sys., Inc. v. Peiker Acustic GMBH & Co. KG*, 762 F.3d 1016, 1029 (10th Cir. 2014) (explaining courts have an independent obligation to ensure subject matter jurisdiction exists).   Because federal courts have an independent obligation to determine whether subject matter jurisdiction exists, a court may raise the question at any stage of the proceeding, even in the absence of any challenge by a party.  *See 1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (*citing Arbaugh v. Y & H Corp.*, 546 U.S. 500, 126 S.Ct. 1235, 1240, 1244, 163 L.Ed.2d 1097 (2006)).

In addition, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may bring either a facial or factual attack on subject matter jurisdiction, and a court must dismiss a complaint if it lacks subject matter jurisdiction.  *See Pueblo of Jemez v. United States*, 790 F.3d 1143, 1147 n.4 (10th Cir. 2015).  For a facial attack, the court takes the allegations in the complaint as true; for a factual attack, the court may not presume the truthfulness of the complaint's factual allegations and may consider affidavits

14

or other documents to resolve jurisdictional facts. *Rural Water Dist. No. 2 v. City of Glenpool,* 698 F.3d 1270, 1272 n.1 (10th Cir. 2012) (citing *Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995)). The burden of establishing jurisdiction rests with the party asserting jurisdiction. *See Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017).

Though not entirely clear, it appears that the IMLCC invokes a few bases for this court's subject matter jurisdiction: (a) § 17(c) of the Interstate Medical Licensure Compact, Colo. Rev. Stat. § 24-60-3602 *et seq.*; (b) the Declaratory Judgment Act, 28 U.S.C. § 1331; and (c) diversity jurisdiction pursuant to 28 U.S.C. § 1332. I consider whether this court has subject matter jurisdiction on the basis of federal question or diversity jurisdiction in turn.

### 1. Federal Question

The court first considers whether it has subject matter jurisdiction arising from its jurisdiction over federal questions.

***Section 17(c) of the Interstate Medical Licensure Compact.*** The IMLCC invokes § 17(c) of the Interstate Medical Licensure Compact ("Compact"), an agreement between certain member states to provide a streamlined process that allows physicians to become licensed in multiple states, as a basis for its claim that Ms. Bowling breached her Independent Contractor Agreement. *See generally* [#1]. *See also* Colo. Rev. Stat. Ann. § 24–60–3602, § 1. Colorado approved and ratified the Compact, effective June 8, 2016. *Id.* The Compact provides for the creation of the IMLCC, whose purpose is the administration of the Compact. *Id.* at § 11(b). One of the delineated duties and powers of the IMLCC is to "[b]orrow, accept, hire, or contract for services of personnel." *Id.* at § 12(h).

Section 17 of the Compact is entitled "Enforcement of Interstate Compact." *Id.* at § 17. Subsection (b) explicitly sets forth the IMLCC's ability to initiate action, either in the United States District Court for the District of Columbia or the federal District Court where the IMLCC has its offices, "to enforce compliance with the provisions of the Compact, and its promulgated rules and bylaws, against a member state in default." *Id.* at § 17(b). Subsection (c), invoked by Plaintiff as its jurisdictional basis, provides "[t]he remedies herein shall not be the exclusive remedies of the Interstate Commission. The Interstate Commission may avail itself of any other remedies available under state law or the regulation of a profession." *Id.* at § 17(c).

As an initial matter, federal question jurisdiction is premised upon "the Constitution, laws, or treaties of the United States," not the separate states. 28 U.S.C. § 1331 (emphasis added). Here, there is no allegation that the United States Congress has ratified or accepted the Compact as federal law. *See generally* [#1]. And Plaintiff's reliance upon the Declaratory Judgment Act does not change that analysis; it is well-settled that "the operation of the Declaratory Judgment Act is procedural only," and does not extend the subject matter jurisdiction of a federal court. Indeed, the United States Supreme Court has observed that:

> If [plaintiff] sought damages from petitioners or specific performance of their contracts, it could not bring suit in a United States District Court on the theory that it was asserting a federal right. And for the simple reason that such a suit would arise under the State law governing the contracts.

*Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 672, 70 S. Ct. 876, 879, 94 L. Ed. 1194 (1950).

Even if a state statute could create federal subject matter jurisdiction, this court did not find, and Plaintiff does not point to, any Colorado Supreme Court or lower court case

that interprets § 17(c) of the Compact. *See Auwae v. Metro. Life Ins. Co.*, 441 F. Supp. 3d 1188, 1191 (D. Colo. 2020) (*citing Phelps v. Hamilton*, 59 F.3d 1058, 1071 (10th Cir. 1995) ("In interpreting Colorado state statutes, federal courts are bound by the interpretations of the Supreme Court of Colorado.") Thus, this court looks to Colorado's rules of statutory construction to predict how the Colorado Supreme Court would rule. *Id.* (citing *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1093 (10th Cir. 2010)). Colorado courts interpreting the state statutes look first to the plain language of the statute. *See Farmers Grp., Inc. v. Williams,* 805 P.2d 419, 422 (Colo. 1991). A plain reading of § 17(c) of the Compact does not suggest a specific separate right of action against an individual for violating a distinct, personal contract—let alone a federal right of action.

Thus, this court concludes that there is no federal question presented to confer subject matter jurisdiction over the Complaint. Indeed, the IMLCC does not challenge the lack of federal question jurisdiction in its Objection. [#26]. It does, however, contend that the court should consider the "Scheduling Order" as proof of the jurisdictional amount. [*Id.*]. The court now turns to consider whether it may maintain subject matter jurisdiction based on diversity jurisdiction.

### 2.    Diversity Jurisdiction

Federal courts may also exercise diversity jurisdiction where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. 28 U.S.C. § 1332(a)(1). It is the plaintiff's burden to establish subject matter jurisdiction, including both the diversity of citizenship of the parties and the jurisdictional amount. *See Radil v. Sanborn W. Camps, Inc.*, 384 F.3d

1220, 1224 (10th Cir. 2004) (observing that "the party invoking federal jurisdiction bears the burden of establishing such jurisdiction as a threshold matter"); *Gibson v. Jeffers*, 478 F.2d 216, 221 (10th Cir. 1973) ("Once the jurisdictional amount is challenged the burden of proving jurisdiction is on the party asserting it.").

The court previously noted that Ms. Bowling did not contest the diversity of citizenship between the Parties [#24 at 8 (citing [#1, #7])],[6] but Ms. Bowling did challenge whether the amount in controversy exceeds the jurisdictional prerequisite, *see* [#7 at 9; #11 at 26].   While ordinarily the plaintiff's claim for damages controls so long as it is made in good faith, *see St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288, 58 S. Ct. 586, 590, 82 L. Ed. 845 (1938), neither the allegations in the Complaint (with respect to a facial attack) nor any evidence (with respect to a factual attack) establishes the jurisdictional amount.

Plaintiff alleges in a conclusory fashion that it seeks

monetary damages, both previously and prospectively, including but not limited to, other costs and expenses to compensate for Plaintif's [sic] recovery of its property as well as damages for indemnity against potential violations of privacy and related claims to third parties and attorneys' fees and costs required by the above referenced contract.  Said damages are in excess of $75,000.

[#1 at ¶ 2].  But there are no <u>factual</u> allegations that underpin this assertion.  For instance,

---

[6] This court pauses briefly to consider the citizenship of IMLCC, which is not pleaded in the Complaint.  [#1].  Section 11(c) of the statute provides that the IMLCC "shall be a body corporate and joint agency of the member states."  Colo. Rev. Stat. § 24-60-3602, § 11(c).  Ms. Bowling appears to be a citizen of the State of Texas.  [#1 at ¶ 6; #7 at 11]. It does not appear that Texas is a member state as of the time of the filing of this action. It is a "well-established rule that diversity of citizenship is assessed at the time the action is filed . . . [and] jurisdiction may not be divested by subsequent events." *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428, 111 S. Ct. 858, 860, 112 L. Ed. 2d 951 (1991).

there is no identification of what property Ms. Bowling continues to withhold from the IMLCC, or the monetary outlay associated with efforts to recover such property. *See generally* [*id*.]. Nor are there any allegations of claims made by third parties that might trigger any indemnity obligations on the part of Ms. Bowling. *See* [*id*.].

Plaintiff's Response to Defendant's Motion to Dismiss does not fare any better. [#10, #10-1]. Instead, the IMLCC refers back to Section A.2 and Section E, Claim I of its Complaint. [#10-1]. But Section A.2 simply includes the quotation previously set forth by this court, *see supra* page 18 (quoting [#1 at ¶ 2]), and Claim I provides no other factual allegations to support the jurisdictional amount, *see* [#1 at ¶¶ 12–13]. This court further notes that, while Plaintiff asserts attorney's fees and costs as damages, it does not articulate any factual basis for this court to conclude that such fees and costs exceed $75,000. *See generally* [#1].

The IMLCC implicitly concedes this point. In its Objection to this court's original Recommendation, *see* [#26], the IMLCC urges the court—for the first time—to consider its statements made in the proposed Scheduling Order submitted by Plaintiff on November 24, 2020 [#15]—which contains allegations not included in either the IMLCC's Complaint or Response to the Motion to Dismiss, but presumably available to the IMLCC. *Compare* [#1] *and* [#10-1] *with* [#15]. The IMLCC does not cite any authority to suggest that it is proper to rely upon a later-filed, proposed Scheduling Order to establish that subject matter jurisdiction existed at the inception of the case. [#10-1, #13]. Nor does it explain why it failed to include the factual allegations in the Complaint itself [#1] or seek to amend its Complaint once it was clear that Defendant was challenging the sufficiency

19

of the amount in controversy. [#10-1].[7]  Further, plaintiffs generally are not permitted to raise new arguments in their objections. *See Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raises for the first time in objections to the magistrate judge's recommendation are deemed waived."); *see also Maurer v. Idaho Dep't of Corr.*, 799 F. App'x 612, 614 n.1 (10th Cir. 2020) (unpublished) (same).  Nevertheless, mindful of Rule 1's admonition with respect to securing a just, speedy, and economical outcome, and the fact that courts do look beyond pleadings to ascertain jurisdictional facts when appropriate, *Paros Prop. LLC v. Colo. Cas. Ins. Co.,* 835 F.3d 1264, 1272 (10th Cir. 2016) (looking to the civil cover sheet to determine the amount in controversy for the purposes of triggering the removal clock), this court will consider the allegations with respect to damages as set forth in the proposed Scheduling Order.[8]  [#15].

---

[7] The IMLCC also did not alert this court to the allegations set forth in the proposed Scheduling Order during the robust conversation regarding subject matter jurisdiction during the Status Conference held on December 1, 2020 [#13, #18].  It also did not move to amend the Complaint as it suggested it might  [#18], and a party may not amend its pleading through its response to a motion to dismiss.  *See Abdulina v. Eberl's Temp. Servs., Inc.*, 79 F. Supp. 3d 1201, 1206 (D. Colo. 2015) (*citing Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995)).  Further, this court respectfully disagrees with any suggestion that it had any obligation to make arguments on behalf of Plaintiff, particularly when the IMLCC has been represented by counsel throughout this action, *see United States v. Davis*, 622 Fed. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself."); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that the court has no obligation to make arguments or perform research on behalf of litigants), and when the proposed Scheduling Order was not at issue, given this court's conversion of the Scheduling Conference to one for a Status Conference prior to the submission of the proposed Scheduling Order.  [#13, #15].

[8] Courts in the Tenth Circuit repeatedly note that there is a strong preference to decide issues on the merits, rather than on procedural grounds. *See Gale v. City & Cty. of Denver*, No. 16-CV-02436-MSK-KMT, 2018 WL 2463242, at *3 (D. Colo. June 1, 2018), *aff'd*, 962 F.3d 1189 (10th Cir. 2020).  Though this court could continue to recommend dismissal of Plaintiff's action for lack of subject matter jurisdiction, it would then be required to proceed to considering whether Defendant's Counterclaim has an independent basis for jurisdiction, and then, whether Plaintiff's claim could appropriately

When faced with a challenge to the amount in controversy, the party seeking to invoke the court's jurisdiction must demonstrate the potential of recovering over $75,000 on its claims.  *See Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1171 (10th Cir. 2011).  In the proposed Scheduling Order, the IMLCC sets forth a Computation of Damages exceeding the jurisdictional minimum of $75,000.  [#15 at 3].  In addition, the IMLCC states on the Civil Cover Sheet that it seeks $100,000 in damages.  [#1-5].  *Cf. Paros Prop.,* 835 F.3d at 1272 (holding that the amount in controversy reflected on a civil cover sheet was sufficient to trigger the removal clock).  This court finds that the IMLCC has sufficiently pled diversity jurisdiction to avoid dismissal based on lack of subject matter jurisdiction.

### B.    Failure to State a Cognizable Claim

This court now turns to Ms. Bowling's arguments that the IMLCC has failed to state a cognizable claim.[9]  In the Complaint, the IMLCC articulates two "Claims for Relief":  (1) "Injunctive Relief Specific Performance"; and (2) "Damages, Fees and Costs."  [#1].  This court considers each in turn.

***Breach of Contract****.*  Because Ms. Bowling proceeds without counsel, this court liberally construes her filings.  It appears that Ms. Bowling argues that the IMLCC has failed to "list any direct causes of action at all" and has failed to plead sufficient facts to sustain a viable claim.  [#7].  In Response, the IMLCC contends that it has sufficiently

---

be asserted in response to Defendant's Counterclaim.  To streamline the legal analysis, this court finds it more appropriate simply to consider the allegations as set forth in the proposed Scheduling Order in conjunction with this Amended Recommendation.

[9] Because it concluded that it lacked subject matter jurisdiction over Plaintiff's original claims, this court did not proceed to Defendant's Rule 12(b)(6) arguments in its original Recommendation.  *See* [#24 at 9 (citing *Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238, 1245 (10th Cir. 2005))].

pleaded the existence of a contract between the IMLCC and Ms. Bowling; such contract imposed certain obligations with respect to the data system that Ms. Bowling managed; and Ms. Bowling did not comply with such terms.  [#10-1 at 8–9].  Though never expressly articulated in either the IMLCC's Complaint or Response to the Motion to Dismiss, it appears that the IMLCC asserts in Claim I a claim for breach of the Independent Contractor Agreement dated April 4, 2019.  [#1 at ¶ 7].

To plead a breach of contract claim under Colorado law, a plaintiff must sufficiently plead a factual basis for the following elements: (1) the existence of a contract, (2) performance by the plaintiff or some justification for nonperformance, (3) failure to perform the contract by the defendant, and (4) resulting damages to the plaintiff. *See PayoutOne v. Coral Mortg. Bankers*, 602 F. Supp. 2d 1219, 1224 (D. Colo. 2009) (citing *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo.1992)).

Here, the IMLCC alleges that it entered an Independent Contractor Agreement with Ms. Bowling dated April 4, 2019 [#1 at ¶ 7]; the Independent Contractor Agreement expired as of June 30, 2020 [*id.*]; as part of the termination provisions of the Independent Contractor Agreement, Ms. Bowling was required to provide certain credentials she held by virtue of being named the "Super Administrator" on behalf of the IMLCC data system [*id.* at ¶¶ 7–8]; and she failed to transfer administrative rights and/or provide passwords to the software and other intellectual property of the IMLCC so that its Executive Director could transition to an alternate technology administrator, thus breaching the contract [*id.* at ¶¶ 7, 12].  The IMLCC also alleges that as a result of this breach, it has incurred "monetary damages" [*id.* at ¶ 14], and as discussed above, alleges that these amount to over the jurisdictional minimum.  Taking these allegations as true, I find that dismissing

the breach of contract claim against Ms. Bowling pursuant to Rule 12(b)(6) would not be appropriate at this time.

*Attorney's Fees and Costs*. This court reads Claim II as a demand for relief for monetary damages, including an award of attorney's fees and costs pursuant to §§ 17(b) and (c) of the Compact, associated with Plaintiff's claim for breach of contract, rather than a separate substantive claim under the Compact.[10] [#1 at ¶¶ 15–17]. Ms. Bowling makes no specific argument regarding dismissal of Plaintiff's demand for monetary damages, attorney's fees, and costs. [#7]. Though she proceeds without counsel, the court cannot and does not act as an advocate for a pro se party, *see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998), and a party's pro se status does not exempt her from complying with the procedural rules that govern all civil actions filed in this District. *See supra* note 3 (citing *Murray v. City of Tahlequah*, 312 F.3d 1196, 1199 n.2 (10th Cir. 2008)). Thus, without passing on the substantive merits of Claim II as a demand for relief, this court does not find that dismissal is appropriate at this time. For these reasons, I respectfully **RECOMMEND** that Defendant's Motion to Dismiss be **DENIED**.

The court now turns to considering Plaintiff's Motion to Strike and Plaintiff's Motion to Dismiss directed at Defendant's Counterclaim.

## II.    Plaintiff's Motion to Strike

Before this court can move to the merits of Plaintiff's Motion to Dismiss, it must consider Plaintiff's request that the court strike Defendant's Response to its Motion to Dismiss "as untimely, improperly formatted, and/or "redundant, immaterial, impertinent,

---

[10] To the extent that the IMLCC is attempting to assert a substantive claim for relief under the Compact, this court concludes that such a claim is not viable for the reasons set forth above.

and scandalous." [#21 at 1, 12]. I find Plaintiff's arguments in favor of striking Defendant's Response unpersuasive for the following reasons.

*Timeliness.* First, Defendant's Response is not untimely. Pursuant to Local Civil Rule 7.1(d), a "responding party shall have 21 days after the date of service of a motion . . . in which to file a response." D.C.COLO.LCivR 7.1(d). If the motion is electronically filed, "[t]he time to respond or reply shall be calculated from the date of electronic service, regardless of whether other means of service are used." D.C.COLO.LCivR 5.1(d). *See also* D.C.COLO.LCivR 7.1(d) ("The date of service of a motion electronically filed shall be determined under D.C.COLO.LCivR 5.1(d)."); Fed. R. Civ. P. 6(a)(1)(A) (when computing a time period stated in days, the day of the event that triggers the period is excluded except where a local rule specifies a method of computing time). But here, Ms. Bowling is not an electronic filer. In addition, there is no indication on the record that she agreed to be served through her electronic mail address. Accordingly, she may only be served by the IMLCC and the court by U.S. Mail.

Plaintiff electronically filed its Motion to Dismiss on December 1, 2020, thereby triggering the 21-day period of time contemplated by Local Rule 7.1(d). But because Ms. Bowling is not an electronic filer, she may only be served by mail—either by the IMLCC or by the court. Rule 6(d) of the Federal Rules of Civil Procedure provides that when a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail), three days are added after the period would otherwise expire under Rule 6(a). Fed. R. Civ. P. 6(d). Thus, the deadline for Ms. Bowling to respond to the Motion to Dismiss fell on December 25, 2020—and was then pushed to December 28, 2020, due to the legal holiday. Fed. R. Civ. P. 6(a)(1). Ms. Bowling's Response to the

Motion to Dismiss was filed on December 23, 2020, before the deadline expired on December 28, 2020.

*Formatting.*   Plaintiff also argues that Defendant's Response should be stricken because it is "improperly formatted." [#21 at 9]. But Plaintiff's Motion to Strike—the very vehicle by which Plaintiff faults Defendant for failing to comply with formatting requirements of the court—is also improperly formatted.  *Compare* [#21 (written in Calibri font)] *with* CMA Civ. Practice Standard 10.1(b) ("All papers filed with the Court shall be in **Arial 12-point font**, including footnotes, and conform to the other formatting requirements (margins, line spacing, etc.) of D.C.COLO.LCivR 10.1.") (emphasis in original).  While this court appreciates Plaintiff's attentiveness to its admonition that the "'Parties should follow practice standards of the presiding judge in all filings for this case,'" [#21 at 3 (citing [#18 at 1]) (emphasis omitted)], it declines to strike the Parties' respective filings for their failure to comply with Judge Arguello's formatting requirements at this time.

But the court reminds <u>both</u> parties that they are required to follow the Federal Rules of Civil Procedure, the Local Rules of this District, and Judge Arguello's Civil Practice Standards. **<u>The Parties are specifically advised that future failure to comply with the Local Rules of this District and/or Judge Arguello's Practice Standards may lead to the striking of any such filings without substantive consideration</u>**.

*Other Arguments.*   Finally, this court declines to recommend dismissal on any of the other grounds offered by Plaintiff.  For example, Plaintiff argues that Defendant's Response should be stricken because she "apparently fails to understand that the appropriate use of a Reply [sic] to a Motion to Dismiss is to pinpoint those specific factual allegations which provide the required notice of the claims which she seeks to prosecute

and the grounds upon which they rest." [#21 at 5].  While Ms. Bowling's arguments may ultimately not prevail, this court finds that this argument is not an appropriate basis for striking her Response.

Plaintiff also argues that the Response should be stricken because Defendant advances new legal theories and allegations therein. [*Id.*]. This court agrees only insofar as it finds that Defendant's Response does include matters not asserted in her Counterclaim. In her Response to Plaintiff's Motion to Dismiss, Ms. Bowling includes a new claim and several allegations not included in her Counterclaim. For example, Ms. Bowling appears to assert for the first time a right to recover "unpaid benefits" under the FLSA, and discusses the Colorado Employment Security Act and Texas Unemployment Compensation Act, none of which are asserted as grounds for recovery in the Counterclaim.  *Compare* [#11] *with* [#20 at 3, 5].[11]  She also asserts new allegations in her Response that, *inter alia*, the "IMLCC Executive Committee came to the consensus that the Executive Director terminated Counterclaimant without authority of the commission and was insubordinate to the Personnel Committee," after which "the IMLCC deemed [Mr. Smith's] contract not renewable." [#20 at 7].  Neither allegation appears in the Counterclaim. *See generally* [#11].

Absent a recognized exception to the rule, "a federal court may only consider facts alleged within the complaint" (or here, counterclaim) when ruling on a Rule 12(b)(6) motion. *See Cty. of Santa Fe, N.M. v. Pub. Serv. Co. of N.M.*, 311 F.3d 1031, 1035 (10th

---

[11] In her Response to Plaintiff's Motion to Strike, Ms. Bowling asserts that her references to the "FLSA, TUCA, and CESA are not claims or defenses," and her "mere mention" of these statutes in her Response to the Motion to Dismiss "does not rise to a claim or defense . . . ." [#23 at 6].

Cir. 2002). Neither the newly asserted legal theories nor the foregoing allegations appear in Defendant's Counterclaim, and unlike the IMLCC's addition of jurisdictional facts that are sometimes drawn from papers outside the pleading, here, it would be inappropriate to allow Ms. Bowling to substantively amend her pleading through her Response to Plaintiff's Motion to Dismiss. *See* [#11]; *Abdulina*, 79 F. Supp. 3d at 1206 (citation omitted).

Rather than striking the Response, however, the court may exercise its discretion and simply disregard any new claims or allegations and all arguments that reference the same. *See Becher v. United Healthcare Servs., Inc.*, 374 F. Supp. 3d 1102, 1108 (D. Kan. 2019) (declining to strike defendants' reply to their motion to dismiss in favor of exercising the court's discretion to disregard matters outside the pleadings and arguments making reference thereto). This court exercises its discretion accordingly, and will not pass on the new claims and allegations set forth in Ms. Bowling's Response in considering whether her counterclaims survive dismissal. Striking Defendant's Response on this basis is therefore unnecessary.  Accordingly, Plaintiff's Motion to Strike [#21] is **DENIED**.

### III.    Plaintiff's Motion to Dismiss

Plaintiff seeks dismissal of all five counts raised in Defendant's Counterclaim for failure to state a cognizable claim.  Before I turn to the merits of the Parties' Rule 12(b)(6) arguments, I must first (a) define further the scope of the record before the court, and (b) determine what law governs Ms. Bowling's counterclaims.

### A.   Scope of the Record

In seeking dismissal of Defendant's Counterclaim under Rule 12(b)(6), Plaintiff relies repeatedly on matters outside the pleadings.  Specifically, Plaintiff asks the court to look beyond the four corners of the Counterclaim to consider both the Agreement attached to its Complaint [#1-2], and arguments advanced by Defendant in her Motion to Dismiss Plaintiff's Complaint [#7].  Yet Plaintiff offers no argument to suggest that these documents are properly considered in the context of Plaintiff's Motion to Dismiss.

Courts may consider matters outside the pleading under Rule 12(b)(6) if the document is "referred to in the complaint," "central to the plaintiff's claim," and the "parties do not dispute [its] authenticity." *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010); *Davis v. BAE Sys. Tech. Sols. & Servs., Inc.*, 764 F. App'x 741, 742 n.1 (10th Cir. 2019). *See also Seattle-First Nat. Bank v. Carlstedt*, 800 F.2d 1008, 1011 (10th Cir. 1986) (applying the same principles to a motion to dismiss a defendant's counterclaim).

Plaintiff does not argue that the Agreement or Defendant's Motion to Dismiss qualify under any of the recognized exceptions to the rule against considering matters outside the pleadings.  To be sure, the Agreement is central to Plaintiff's breach of contract claims and attached as an exhibit to the Complaint. *See* [#1-2].  "But at the motion to dismiss stage, the court cannot properly consider extrinsic evidence that isn't central to the [challenged] claims. This is the rule even if the extrinsic evidence is central to the [moving party's] theories of defense." *Becher*, 374 F. Supp. 3d at 1106 (citation omitted). In the absence of any argument concerning whether the documents are central to Defendant's Counterclaim, the court cannot and does not consider them in deciding

Plaintiff's Motion to Dismiss.[12]

Having thus determined the scope of its review, this court must still determine what law governs Defendant's counterclaims before it can assess whether Ms. Bowling's Counterclaim "alone is legally sufficient to state a claim for which relief may be granted." *See Hogan*, 453 F.3d at 1252.

### B.   Rule 8(a)

***Federal Causes of Action***. First, this court addresses Ms. Bowling's invocation of federal law for Counterclaims I (misclassification); II (wrongful termination); and V (intentional infliction of emotional distress).[13]   Among other arguments, though without specifically invoking Rule 8(a) of the Federal Rules of Civil Procedure, the IMLCC contends that these claims should be dismissed for failure to reference a specific legal authority.  *See, e.g.*, [#17-1 at 6].  Rule 8(a) provides that a complaint "must contain: (1) a short and plain statement of the grounds for the court's jurisdiction, . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for the relief sought . . . ."  Fed. R. Civ. P. 8(a).  Courts in this District have interpreted the requirements of Rule 8 to include identifying the legal basis for each claim.  *See Wolf v. [No Defendants Named]*, No. 11-CV-02185-WYD-CBS, 2011 WL 4973667, at *3 (D. Colo. Sept. 23, 2011), *report and recommendation adopted sub nom. Wolf v. Pub. Tr. of Gilpin*

---

[12] I also decline to recommend the conversion of Plaintiff's Motion to Dismiss into one for summary judgment because neither Party asks the court to do so; the instant Motion was filed at an early stage of this litigation; and the court has not provided the Parties with any notice of an intent to apply the summary judgment standard.  *See Becher v. United Healthcare Servs., Inc.*, 374 F. Supp. 3d 1102, 1108 (D. Kan. 2019).

[13] Ms. Bowling identifies the federal False Claims Act as the basis for Counterclaim III, and does not appear to invoke federal law for Counterclaim IV.  [#11].  Thus, these two counterclaims are not included in this analysis.

*Cty.*, No. 11-CV-02185-PAB-CBS, 2011 WL 4972081 (D. Colo. Oct. 19, 2011).  To the extent Ms. Bowling seeks to invoke federal law for Counterclaims I, II, and V, this court respectfully agrees that she has failed to satisfy Rule 8(a) by failing to identify the federal basis for Counterclaims I, II, and V, and the facts as alleged do not readily lend themselves to particular federal laws.

*State Causes of Action.*  Similarly, the court concludes that Ms. Bowling has failed to adequately identify a state law basis for Counterclaim I for misclassification. Plaintiff argues that Defendant fails to identify the legal theory under which her "misclassification" counterclaim is asserted, and further fails to allege any facts that would plausibly qualify her as the IMLCC's employee. [#17-1 at 6–7].  In her Response, Ms. Bowling cites to Colorado, Texas, and federal law to argue that the court must consider the "relationship, control, ongoing services, whether the role is a permanent position, and direction of the Employer to the individual providing services." [#20 at 3 (citing the Colorado Employment Security Act, FLSA, and Texas Unemployment Compensation Act)].  But what she does not do in her Complaint or Response is specifically identify the state law upon which she is proceeding.  [#11 at 15–16].  The Tenth Circuit has stated that liberal construction of pro se pleadings "means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *United States v. $9,020.00 In U.S. Currency*, 30 F. App'x 855, 858 (10th Cir. 2002) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)) (determining whether pro se plaintiff stated a claim under Fed. R. Civ. P. 12(b)(6)).  It does not follow, however, that this court may craft a

claim on behalf of Defendant from whole cloth. *Acker v. Dinwiddie*, 516 F. App'x 692, 693 (10th Cir. 2013) ("To be sure, it is well-settled that we read a pro se litigant's petition with a special solicitude. But we are not his advocates, and we cannot create arguments on his behalf out of whole cloth."); *Tucker v. U.S. Ct. of Appeals for the Tenth Cir.*, 815 F. App'x 292, 293 n.1 (10th Cir. 2020) (stating that the Court must "stop short of serving as [the pro se litigant's] advocate or crafting arguments on his behalf"); *United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009) ("[T]his rule of liberal construction stops, however, at the point at which we begin to serve as his advocate."). Instead, it appears more appropriate for this court to consider Ms. Bowling's allegations regarding misclassification as an element of her wrongful discharge claim.

This court does not arrive at the same conclusion with respect to Counterclaims II, IV, and V, insofar as Ms. Bowling invokes state common law, because each of these counterclaims—for wrongful discharge in violation of public policy, libel, and intentional infliction of emotional distress, respectively—are readily recognizable under state common law. Applying the liberal standard afforded to pro se litigants, each of these counterclaims sounds in state common law and are thus not properly dismissed pursuant to Rule 8(a).

Accordingly, this court respectfully **RECOMMENDS** that Counterclaims II and V be **DISMISSED** insofar as they are premised on federal law, and Counterclaim I be **DISMISSED** in its entirety.

### C. Choice of Law

Nevertheless, it is not clear from Ms. Bowling's Counterclaim the specific state law upon which she proceeds for Counterclaims II and V. In Counterclaim IV for libel, Ms.

Bowling invokes Texas law. [#11 at 21–26]. But she does not identify the state law upon which she bases Counterclaims II or V—which is essential to determining what elements apply and whether Ms. Bowling has sufficiently pleaded those elements in her Counterclaim. *See generally* [#11]. The court must therefore determine which state's laws apply to Defendant's state law claims. Thus, the court turns to a critical issue not briefed by either Party—choice of law.[14] Federal courts sitting in diversity apply the choice-of-law rules of the forum state. *See Anderson v. Commerce Const. Servs., Inc.*, 531 F.3d 1190, 1193 (10th Cir. 2008). Because this court sits in Colorado, it applies Colorado choice of law principles.

   ***Counterclaims II and V.*** Colorado classifies wrongful discharge in violation of public policy, defamation, and intentional infliction of emotional distress claims as torts. *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 102, 104 (Colo.1992). For tort claims, Colorado follows the Restatement (Second) of Conflict of Laws and applies the law of the state with "the most significant relationship" to the occurrence and parties. *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 509–10 (Colo. 2007). The most significant relationship is determined by considering the following principles:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws §§ 6(2), 145. In applying these principles,

---

[14] Though not entirely clear, it appears that the IMLCC proceeds under Colorado law. *See, e.g.*, [#17-1 at 9, 11].

courts must take the following contacts into account:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

*Id.* § 145(2).  Context determines the relative importance of these contacts.  *See Boone v. MVM, Inc.*, 572 F.3d 809, 811–12 (10th Cir. 2009).  For example, "'when the injury was caused by an act done in the course of the relationship, the place where the relationship is centered' should be considered." *Id.* (quoting Restatement (Second) of Conflict of Laws § 145 cmt. e).

Construed liberally, the Counterclaim alleges that Ms. Bowling was injured in Texas, where she resides.  But the conduct giving rise to Ms. Bowling's counterclaims appears to have occurred predominantly—if not exclusively—in Colorado; the IMLCC's principal place of business is Colorado; and the Parties' employment relationship was centered in Colorado. *See Cejka v. Vectrus Sys. Corp.*, No. 15-cv-02418-MEH, 2016 WL 898815, at *18 (D. Colo. Mar. 9, 2016) ("[A]lthough the Plaintiffs reside outside of Colorado, Vectrus is headquartered here and, thus, its employment relationship with the Plaintiffs also is centered in Colorado.").  Because Colorado has the most significant relationship to this employment dispute, the court applies Colorado law to Counterclaims II and V.[15] *See id.*; *Norwood v. ITT Sys. Corp.*, No. 10-cv-00052-RPM, 2011 WL 221441, at *1 ("[T]he defendant is an employer in Colorado and Colorado has clear authority to

---

[15] Because this court applies Colorado law to Ms. Bowling's wrongful discharge claim, which is actionable only upon finding that Ms. Bowling was an employee, *see infra* pages 37–38, it follows that Colorado law governs whether Ms. Bowling was misclassified as an independent contractor.

regulate the conduct of a Colorado employer in discharging an employee.").

**Counterclaim IV.**  Ms. Bowling cites Texas law in support of her defamation claim [#11 at 21–22], while the IMLCC cites Colorado law and asserts—without elaboration—that "Texas law is not applicable to the case," [#17-1 at 14].  Neither Party provides any meaningful argument with respect to the applicability of Texas or Colorado law.  In her Response, Ms. Bowling does not counter Plaintiff's assertion that Colorado law applies to her defamation claim, and thus, appears to implicitly agree that Colorado law governs whether the statements at issue are defamatory.

The alleged defamatory statements were made in Colorado; published to 31 commissioners in 44 states; and allegedly caused reputational harm to Ms. Bowling, who resides in Texas.  Although not cited by either Party, the court notes that the Restatement (Second) of Conflict of Laws § 149 (1971) provides that "[i]n an action for defamation, the local law of the state where the publication occurs determines the rights and liabilities of the parties"—unless (in the case of multistate defamation) § 150 applies, or "some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied." I find § 150 applicable because it pertains to multistate defamation, and Defendant claims that Mr. Smith sent his allegedly defamatory email to 31 commissioners in 44 states.

"When a natural person claims that he or she has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time if the matter complained of was published in that state." AMJUR LIBEL § 17 (2021) (citing Restatement (Second) of Conflict of Laws § 150).  But is not clear from the Counterclaim whether publication ever occurred in Texas.

And in any event, "a state which is not the state of the [claimant]'s domicile may be that of the most significant relationship if it is the state where the defamatory communication caused [her] the greatest injury to . . . her reputation," such as the state where: (1) she is better known, (2) the activity related to the matter claimed to be defamatory is principally located, (3) she suffered greater special damages, or (4) the allegedly defamatory matter was principally circulated. *Id.*

For the same reasons articulated above, I find that Ms. Bowling's relationship with the IMLCC was centered in Colorado. Because the allegedly defamatory statement relates to the termination of the same relationship, I find that "the activity" (Ms. Bowling's relationship with the IMLCC) "related to the matter claimed to be defamatory" (Mr. Smith's email) is principally located in Colorado.  And given that the IMLCC is headquartered in Colorado and Mr. Smith, as Executive Director of the IMLCC, sent an email from Colorado to individuals in at least 31 states, this court finds that Colorado has the most significant relationship with the Parties for purposes of Ms. Bowling's defamation claim.

Finally, this court notes that neither Party argues that Colorado law does not apply, and Plaintiff specifically relies on Colorado defamation law in briefing its Motion to Dismiss. Thus, the Parties "appear to agree that Colorado law controls [Defendant's] defamation claim in this diversity action." *Nguyen v. Mai Vu*, No. 18-cv-01132-CMA-NRN, 2018 WL 5622634, at *4–5 (D. Colo. Oct. 30, 2018) (quoting *Zykronix, Inc. v. Conexant Sys., Inc.*, No. 16-CV-00163-KLM, 2017 WL 5624577, at *3 (D. Colo. Nov. 22, 2017) (citing *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1180–81 (10th Cir. 2007))) (internal brackets omitted).  Moreover, "the parties have not identified any conflict between the laws of Colorado and Texas vis-a-vis defamation that would be dispositive,"

and thus "it appears that choice of law will not significantly affect the outcome of the dispute." *Id.* at *5 n.11 (quoting *Copic Ins. Co. v. Wells Fargo Bank, N.A.*, 767 F. Supp. 2d 1191, 1205 (D. Colo. 2011)) (internal brackets omitted).[16]   The court will therefore apply Colorado substantive law to Counterclaim IV as well.

### D.    Rule 12(b)(6)

Having resolved the choice of law issues in favor of the application of Colorado law to Counterclaims II, IV, and V, this court now turns to the application of Rule 12(b)(6) to Defendant's remaining counterclaims.

### 1.  Counterclaim II:  Wrongful Discharge

Colorado courts recognize an exception to the at-will employment relationship if the termination stems from the employee's refusal to engage in illegal or unethical conduct, or if the employee exercises a job-related right. *See Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540, 547, 551–52 (Colo. 1997) ("[A]n employee, whether at-will or otherwise, should not be put to the choice of either obeying an employer's order to violate the law or losing his or her job.") (internal quotation marks omitted).

To plead a viable wrongful discharge in violation of public policy ("wrongful discharge") claim, Ms. Bowling must allege that the IMLCC (1) employed Ms. Bowling, (2) terminated her employment, and (3) terminated her employment in retaliation for her

---

[16] *Compare Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 138 F. Supp. 3d 1191, 1197 (D. Colo. 2015) (under Colorado law, a claimant must allege "(1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication.") (quotation omitted), *aff'd*, 861 F.3d 1081 (10th Cir. 2017) *with Brown v. Swett & Crawford of Tex., Inc.*, 178 S.W.3d 373, 382 (Tex. App. 2005) (citing *WFAA-TV, Inc. v. McClemore*, 978 S.W.2d 568, 571 (Tex. 1998)) .

refusal to engage in illegal conduct.  *See Brown v. Premier Roofing*, LLC, 173 F. Supp. 3d 1181, 1184 (D. Colo. 2016) (applying Colorado law); *Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.*, 186 P.3d 80, 83 (Colo. App. 2008) (internal citations and quotations omitted); *Madison Servs. Co., LLC v. Gordon*, No. 09-cv-02369-MSK-KMT, 2010 WL 3529588, at *6 (D. Colo. Sept. 2, 2010) (denying motion to dismiss counterclaim for wrongful discharge under Colorado law).[17]  To satisfy the third element, Ms. Bowling must also allege facts showing that the IMLCC was aware, or reasonably should have been aware, that her refusal was based on a reasonable belief that the requested action was illegal.  *Carskadon v. Diva Int'l, Inc.*, No. 12-cv-01886-RM-KMT, 2014 WL 7403237, at *11 (D. Colo. Feb. 26, 2014) (citing *Martin Marietta Corp.*, 823 P.2d at 100).

  *Employer-Employee Relationship.*  Plaintiff argues that Defendant fails to state a wrongful discharge claim because she fails to allege facts sufficient to show that she was a party to an employment agreement.  [#17-1 at 7–12].  Because "Colorado courts . . . have not decided if wrongful discharge protection applies to independent contractors," courts in this District have endeavored to "predict how Colorado's highest court would rule on enlarging this public policy exception to include independent contractors." *Wisniewski v. Med. Action Indus., Inc.*, No. 99–D–409, 2000 WL 1679612,

---

[17] Defendant asserts her wrongful discharge counterclaim against Plaintiff under *Sabine Pilot Servs., Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985).  Under Texas law, there is an exception to the state's employment-at-will doctrine, "which permits suits for wrongful termination where the employee was terminated for refusal to perform illegal acts." *White v. FCI USA, Inc.*, 319 F.3d 672, 674 (5th Cir. 2003) (citing *Sabine Pilot*, 687 S.W.2d at 735). To establish a prima facie case of wrongful termination under *Sabine Pilot*, Defendant must show that: (1) she was required to commit an illegal act which carries criminal penalties; (2) she refused to engage in the illegality; (3) she was discharged; and (4) the sole reason for her discharge was a refusal to commit an unlawful act. *Id.* at 676 (citing *Sabine Pilot*, 687 S.W.2d at 735).

at *3 (D. Colo. Sept. 27, 2000); *see also Barlow v. C.R. England Inc.*, No. 09-cv-02476-CMA-MJW, 2013 WL 3851016, at *3 (D. Colo. July 25, 2013). The majority of courts hold that independent contractors may not state wrongful discharge claims. *Barlow*, 2013 WL 3851016, at *3 (collecting cases); *Wisniewski*, 2000 WL 1679612, at *4 (collecting cases). But what type of agreement (i.e., independent contractor vs. employment) Ms. Bowling signed is only one consideration, and not dispositive, as to whether she is properly classified as an independent contractor or as an employee of IMLCC. *See, e.g., Insul-Lite Window & Door Mfg., Inc. v. Indus. Comm'n*, 723 P.2d 151, 151 (Colo. App. 1986) ("Even though a contract . . . may be framed to suggest the existence of an independent contractor and not an employer-employee relationship, that fact alone is not dispositive of the nature of the relationship. The primary concern is with what is done under the contract, and not what it says.")  (internal citations omitted) (applying Colorado law in unemployment compensation context); *Farmland Partners Inc. v. Rota Fortunae*, No. 18-cv-02351-RBJ, 2021 WL 765362, at *10 (D. Colo. Feb. 26, 2021) (finding that the agreement clearly identified worker as an "independent contractor" but agreeing with plaintiff's argument that the parties' labeling the worker as an independent contractor was not dispositive under the factors set forth in Restatement (Second) of Agency § 220)); *Courtney v. Class Transp., Inc.*, No. 18-cv-02335-RBJ, 2021 WL 119331, at *12 (D. Colo. Jan. 13, 2021) (applying the right-to-control test under Colorado law and noting that "merely labeling  someone an 'independent contractor' does not make him one") (citing *Faith Realty & Dev. Co. v. Indus. Comm'n*, 460 P.2d 228, 229 (Colo. 1969)).

Instead, Colorado common law governs the determination of worker status for wrongful discharge claims. *See Zinn v. McKune*, 143 F.3d 1353, 1357 (10th Cir. 1998)

(stating that the definition of employee "should be fleshed out by applying common-law agency principles to the facts and circumstances surrounding the working relationship of the parties"); *Roth v. Am. Hosp. Supply Corp.*, 965 F.2d 862, 866 (10th Cir. 1992) (in the absence of clear legislative guidance, "the common law definition of 'employee' is controlling"); *Norton v. Gilman*, 949 P.2d 565, 567–68 (Colo. 1997).

Here, the IMLCC has failed to address the Colorado common law principles governing the classification of the Parties' working relationship, e.g., the employer's right to control the worker; extent of control that the employer exercises over the details of the work; method of payment, whether by time or job; whether the employer supplies instrumentalities, tools, and place of work; and the right to terminate. *See* [#17-1 at 7– 12]. Nor did it address these principles in seeking to dismiss Counterclaim I. [*Id.* at 5–7]. Ms. Bowling alleges that she was tasked with creating and implementing the automation to push the IMLCC into production. [#11 at ¶ 2]. She alleges that she was working seven days per week, and directly responding to physicians and licensing staff. [*Id.* at ¶ 6]. She also details her responsibilities, including customer service, financial analysis, technical analysis, quality assurance, vendor procurement, training, event planning, and product support. [*Id.* at ¶ 10]. And while the IMLCC may dispute the merits of whether Ms. Bowling is properly classified as an independent contractor, it fails to enumerate each element that it contends that Ms. Bowling should have alleged, but did not. *See* CMA Civ. Practice Standard 7.1(D)(d)(1). Thus, this court is not persuaded that dismissal is appropriate on this ground.

**Termination**. Plaintiff argues that Ms. Bowling's wrongful discharge must fail, in part, because she

fails to allege any facts which suggest a new agreement was entered, or that a mutual agreement of the Parties was reached thereby extending the term of the Agreement.  With the existing Agreement expiring by operation of law on June 30, 2020, by its own terms, it is both contradictory, and without legal basis for Defendant to assert a wrongful termination claim against Plaintiff.

[#17-1 at 8].  Ms. Bowling alleges that she was "essen[tially] terminated" from her position in June 2020 when Mr. Smith circulated an email announcing that she had declined to renew her Independent Contractor Agreement. [#11 at ¶ 42]. Plaintiff provides no legal authority to support its contention that the expiration of a fixed-term employment contract precludes a wrongful discharge claim premised on the non-renewal of the same.

Indeed, in related contexts, courts have treated the non-renewal of a fixed-term contract tantamount to termination. *See, e.g., Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008) (employer violates Title VII if it "fail[s] to renew an employment arrangement . . . for a reason prohibited by Title VII"); *accord Smith v. Univ. of N.C.*, 632 F.2d 316, 341 (4th Cir. 1980) (college professor who alleged that her employment contract was not renewed "established a prima facie case of discrimination" under federal laws); *see also Saridakis v. S. Broward Hosp. Dist.*, 681 F. Supp. 2d 1338, 1348 (S.D. Fla. 2009) ("[T]he majority of courts in recent years have deemed non-renewal the equivalent of termination . . . for purposes of a Title VII discrimination analysis."); *Nini v. Mercer Cty. Cmty. Coll.*, 968 A.2d 739, 744–45 (N.J. App. Div. 2009) ("[N]o functional difference exists between the failure to reappoint at the end of a fixed term and the dismissal of an at-will employee.") (applying New Jersey law); *Johnson v. Trs. of Durham Tech. Cmty. Coll.*, 535 S.E.2d 357, 362 (N.C. Ct. App. 2000) ("As the failure to renew an employee's contract produces the adverse result of terminating her employment, . . . the failure to renew an employment contract constitutes an adverse employment action . . . .")

(applying North Carolina law); *Perry v. Sindermann*, 408 U.S. 593, 598 (1972) ("[T]he nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights."); *Cejka v. Vectrus Sys. Corp.*, 823 F. App'x 591, 598–99 (10th Cir. 2020) (under Colorado law, non-at-will employees may bring wrongful discharge claims).

Here, Ms. Bowling alleges facts sufficient to support the inference that her employment contract was not renewed.  Specifically, she alleges that in June 2020, as her contract term was set to expire [#11 at ¶¶ 38–39], Mr. Smith offered Ms. Bowling a two-month contract extension, despite knowing that this offer was not "beneficial to Ms. Bowling," [*id.* at ¶ 39].  Days later, Mr. Smith sent a Commission-wide email stating that Ms. Bowling's relationship with the IMLCC would terminate on June 30, 2020 because she had "willfully declined to renew her contract," which was not true. [*Id.* at ¶¶ 40–41]. Mr. Smith then reiterated a similar message to Ms. Bowling via email, stating that because she was "willful in not signing a new contract" despite his offered two-month extension, her relationship with the IMLCC would terminate on June 30, 2020. [*Id.* at ¶ 42].  Thus, to the extent Plaintiff argues that Ms. Bowling has not pled the requisite "termination" element of her wrongful discharge claim, this court respectfully disagrees.

*Illegal Act.*  Plaintiff also argues that Counterclaim II must be dismissed because "Defendant fails to state any illegal act which she was requested to perform." [#17-1 at 10].  In Response, Defendant points to her allegations that she was "being pressured to disseminate state owned medical licensing data to an external organization," and the "criminal penalties in every state for such an illegal action" including "disseminating the physician's data (Personal Identifiable Information) which is stored in the IMLCC

systems." [#20 at 6].  Indeed, Ms. Bowling alleges in her Counterclaim that she was

> pressured, admonished, and threatened with defamation for refusing to generate/disseminate IMLCC data to the FSMB whether manually or by an automatic technical bridge under the table and without the IMLCC's commission authority. Ms. Bowling's resistance to build the illegal integration was misarticulated to others . . . .

[#11 at 17].

Plaintiff argues that Ms. Bowling "[n]ot only . . . failed to allege specifics as to who directed her to perform an illegal act or even a description of what the illegal act might have been, she has failed to allege what statute related to health safety or welfare, [sic] the purported act might violate." [#17-1 at 11].  But Ms. Bowling alleges that Mr. Smith repeatedly asked her to develop an "illegal integration" between the IMLCC and the FSMB to share "IMLCC physician and medical licensing data," the dissemination of which is "highly illegal." [#11 at 6].  She further claims that the information that Mr. Smith asked her to disseminate is "protected and belongs to the states," which "have laws prohibiting" and "criminal offense[s]" attached to "the dissemination of this data." [*Id.*].

In addition, Ms. Bowling alleges that the IMLCC "also has aligning statutes forbidding the dissemination of data."  [#11 at ¶ 17].  She cites to a section that provides that the "Interstate Commission is prohibited by the Compact from providing any and all licensure, complaint, disciplinary and investigatory information maintained in the coordinated information system, including a core data set, to any individual, entity or organization other than a member state board."  [*Id.*].  Taking these facts as true and drawing all inferences in favor of Ms. Bowling, I find the foregoing allegations sufficient to plausibly allege the requisite illegal act to support Ms. Bowling's wrongful discharge claim.

Accordingly, with respect to Counterclaim II for wrongful discharge, I respectfully **RECOMMEND** that Plaintiff's Motion to Dismiss be **DENIED**.

### 2.    Counterclaim III:  Retaliatory Discharge Under the FCA

Even construed liberally, the Counterclaim fails to assert a retaliatory discharge claim under the whistleblower provision of the False Claims Act, 31 U.S.C. § 3730(h)(1). "The [False Claims Act] covers all fraudulent attempts to cause the government to pay out sums of money." *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (internal quotation marks omitted). "Because employees will often be in the best position to report frauds perpetrated by their employers, the statute includes a whistleblower provision to protect employees from retaliation." *Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 908 F.3d 610, 613 (10th Cir. 2018) (internal quotation marks omitted). The whistleblower provision provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).  *See also Armstrong v. The Arcanum Grp., Inc.*, 897 F.3d 1283, 1286 (10th Cir. 2018) (quoting 31 U.S.C. § 3730(h)(1)).  To state a plausible retaliation claim, Ms. Bowling must allege:

1. she engaged in protected activity,

2. of which the IMLCC was aware, and

3. the IMLCC retaliated against her "because of" that protected activity.

*United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 764 (10th Cir. 2019).

The present dispute turns on the first of these elements—that the employee engaged in a "protected activity." The IMLCC argues that Counterclaim III must be dismissed because Ms. Bowling fails to allege that she engaged in protected activity.

According to the IMLCC, "Defendant never directly accuses Plaintiff or its agent of committing any fraud." [#17-1 at 13].  Instead, it argues that "she furnishes the Court a lesson on how a bookkeeper might commit fraud," and merely "offer[ing] self-serving, hypothetical scenarios in which a potential misappropriation would be identifiable," and "allud[ing] to misappropriations and fraud" does not "trigger relief under this subsection," [*id.* at 12–13].  The IMLCC further argues that, even if Ms. Bowling did allege a protected activity, she fails to allege facts sufficient to show that she was terminated because of that protected activity. See [*id.*].[18]  Defendant counters that she has alleged that she, "on multiple occasions, called up meetings for financial controls, audits, and delivered well documented reasons why misappropriations are the cause for concern. An audit was inevitable with [Ms. Bowling's] financial project ensuing. There would be no way around the requirement of a financial audit." [#20 at 7].

Even presuming the factual allegations in the Counterclaim are true, as this court must at this stage, I conclude Counterclaim III fails to state a plausible retaliation claim. While the viability of her retaliation claim does not hinge on whether she adequately pleads violations of the False Claims Act, *see United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996) (explaining that "the case law is clear that a retaliation claim can be maintained even if no FCA action is ultimately successful or even filed"), Ms. Bowling fails to allege facts which, taken as true, satisfy the requirement that she engaged in protected activity.

---

[18] Plaintiff argues that, like Counterclaim II, Counterclaim III should be dismissed because it is premised on Defendant's "erroneous" contention "that she was a party to an employment agreement." [#17-1 at 7–8]. This court respectfully disagrees.  The False Claims Act's whistleblower protections expressly include both employees and contractors. *See* 31 U.S.C. § 3730(h)(1).

A covered person engages in "protected activity" in two situations: (1) when they engage in "lawful acts . . . in furtherance of an action under [the False Claims Act]," or (2) when they engage in lawful acts in furtherance of "other efforts to stop 1 or more violations of" the False Claims Act." 31 U.S.C. § 3730(h)(1).  Only the second situation applies in this case.[19]

The Tenth Circuit has not yet defined the boundaries of what constitutes protected efforts to stop a violation of the False Claims Act, so courts look to other circuits for guidance on the subject. The Fourth and Sixth Circuits have adopted "an objectively-reasonable-belief standard," *see Armstrong v. Arcanum Grp. Inc.*, No. 16-cv-1015-MSK-CBS, 2017 WL 4236315, at *6 (D. Colo. Sept. 25, 2017), under which courts ask whether the claimant alleges facts sufficient to show that she believed her employer was violating the False Claims Act; this belief was reasonable; that she took action based on that belief; and that her actions were designed to stop the perceived False Claims Act violation. *See, e.g., Adams v. ATAC Servs., LLC*, No. 20-cv-00576-PRW, 2021 WL 1630547, at *2–3 (W.D. Okla. Apr. 27, 2021).  *See also Singletary v. Howard Univ.*, 939 F.3d 287, 297 (D.C. Cir. 2019) (a claimant can show "protected activity" by "plausibly alleg[ing] facts showing that she took lawful measures to stop or avert what she reasonably believed would be a violation of the False Claims Act").

Like other courts in this District, *see Armstrong*, 2017 WL 4236315, at *7, and this Circuit, *see Adams*, 2021 WL 1630547, at *2–3, this court adopts the "objectively reasonable belief" standard and finds that—on the facts alleged—the Counterclaim fails

---

[19] The Counterclaim contains no facts indicating that Ms. Bowling was preparing to bring a qui tam action or to assist the Government in bringing an action under the False Claims Act. *See generally* [#11].

to permit the inference that Ms. Bowling held an objectively reasonable belief that Mr. Smith was violating the False Claims Act.  The False Claims Act prohibits, in relevant part, knowingly making false records or statements in connection with a false claim. 31 U.S.C. § 3729(a)(1)(B); *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 539 (10th Cir. 2020) (applying elements of false records claims under the False Claims Act); *United States ex rel. Brooks v. Stevens-Henager Coll., Inc.*, 359 F. Supp. 3d 1088, 1109 (D. Utah 2019) (explaining that § 3729(a)(1)(B) "remove[s] any defense that the defendant did not personally submit, or cause to be submitted, a false claim"); *United States ex rel. Tra v. Fesen*, 403 F. Supp. 3d 949, 963 (D. Kan. 2019).[20]  "Factually false claims generally require a showing that the payee has submitted an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *United States ex rel. Thomas v. Black & Veatch Special Projects Corp.*, 820 F.3d 1162, 1168 (10th Cir. 2016) (internal quotation marks omitted).

Here, in Summer 2019, after Ms. Bowling "realized Mr. Smith had been mixing cash accounting with accrual accounting to . . . sabotage Bowling's actuals to budget," she joined IMLCC commissioners in requesting an audit of the IMLCC's financials.  [#11 at ¶ 21].  Following complaints from vendors and licensing boards about non-payment and "faulty reimbursements," respectively [*id.* at ¶ 25], and continuing accounting

---

[20] Given that Ms. Bowling does not allege any facts to suggest that Mr. Smith or the IMLCC presented a claim for payment or approval, this court interprets her claim as a false records cause of action under the False Claims Act. *Compare* 31 U.S.C. § 3729(a)(1)(A) (false claims liability attaches to a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval[.]") *with* 31 U.S.C. § 3729(a)(1)(B) (false records liability attaches to a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]").

"misapplications" to Ms. Bowling's actuals-to-budget spreadsheet maintained by Mr. Smith—including "missing credits" [*id.*]—Ms. Bowling requested a meeting with Mr. Smith and several IMLCC commissioners to "explore implementing proper business financial controls to deter any future questions of misappropriations," [*id.* at ¶ 26].  After no action was taken, Ms. Bowling subsequently proposed and obtained budget approval from the IMLCC for a new 2020-2021 project: the implementation of a financial accounting system. [*Id.* at ¶ 37].  Implementation of Ms. Bowling's financial project would require "an audit of historical financial information." [*Id.*].

But Ms. Bowling makes no allegations that any of these purported fraudulent activities was directed at <u>submitting to the federal government</u> a false or fraudulent claim for payment.  The False Claims Act is not "an all-purpose antifraud statute."  *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2003, 195 L. Ed. 2d 348 (2016). Rather, the "objective of Congress in enacting the False Claims Act 'was broadly to protect the funds and property of the Government <u>from fraudulent claims</u>."  *United States v. Neifert-White Co.*, 390 U.S. 228, 233, 88 S. Ct. 959, 962, 19 L. Ed. 2d 1061 (1968) (emphasis added).  *See also McCrary v. Knox County*, 200 F. Supp. 3d 782, 793 (N.D. Ind. 2016) ("The FCA attaches liability for specific acts of fraud; it does not seek to punish fraud in a general sense."); *Hickman v. Spirit of Athens Ala., Inc.*, No. 5:16-cv-01595-MHH, 2019 WL 861131, at *4 (N.D. Ala. Feb. 22, 2019) ("[T]he FCA's anti-retaliation provision does not provide a remedy for every act undertaken to prevent fraud that may relate in some way to government funds.").

Here, Ms. Bowling's retaliation claim fails because she does not allege a type of fraud to which liability under the False Claims Act may attach.  The only allegations Ms.

Bowling makes with respect to payment by the United States Government are general references to "misappropriations of federal funds" [#11 at 19, 20] and the IMLCC's ongoing receipt of federal grants [*id.* at ¶ 2]. Indeed, Ms. Bowling

> alleges only that [Defendant] receives some federal funding. [She] does not allege that [Defendant] would or did submit any type of claim to the federal government for reimbursement relating to the [misconduct] at issue. For example, [she] does not allege that [Defendant] [was] preparing, or causing someone to prepare, false financial or other records that would be submitted to the federal government. Again, merely alleging that [Defendant] receives some federal funding—without tying that funding to [its alleged misconduct] and a subsequent claim—is insufficient to allege retaliation under the FCA.

*McCrary*, 200 F. Supp. 3d at 793.   *See also id.* at 794 n.4 (noting that the foregoing rationale applies to both categories set forth in 31 U.S.C. § 3730(h)(1)); *KeyPoint Gov't Sols.*, 923 F.3d at 767 (agreeing with proposition that relator's activities under § 3730(h)(1) "must still have a nexus to a False Claims Act violation") (internal alterations omitted).

In other words, Ms. Bowling's vague allegation that the IMLCC continues to receive some federal funding is simply not enough to bring her retaliation claim within the purview of the False Claims Act.  *McCrary*, 200 F.3d at 792.  Thus, I find that Ms. Bowling has not sufficiently alleged facts to state a plausible False Claims Act retaliation claim. Accordingly, I respectfully **RECOMMEND** dismissal of Counterclaim III.

### 3.   Counterclaim IV:  Libel

"The elements of a libel claim are: (1) a written defamatory statement of and concerning the plaintiff; (2) published to a third party; (3) with the publisher's fault amounting to at least negligence; and (4) either actionability of the statement irrespective of special damages or the existence of special damages caused by the publication." *McGettigan v. Di Mare*, 173 F. Supp. 3d 1114, 1125–26 (D. Colo. 2016) (applying

Colorado law).   Absent any meaningful briefing on the issue, this court interprets Counterclaim IV as a purely private defamation claim.

Plaintiff first argues that Defendant fails to allege "that a defamatory statement was made or the contents of such statement and to whom it was published." [#17-1 at 15].[21] At the outset, I find Plaintiff's bald assertion that Defendant fails to allege the contents of any allegedly defamatory statement or publication of the same plainly belied by Ms. Bowling's allegations.  Ms. Bowling alleges that Mr. Smith sent a defamatory email to the entire Commission on June 20, 2020, wherein Mr. Smith stated that Ms. Bowling's last day with the IMLCC would be June 30, 2020 because she had "willfully declined to renew her contract." [#11 at ¶ 41].  I turn now to consider the IMLCC's argument that Ms. Bowling has failed to allege facts sufficient to satisfy the element that requires Mr. Smith's statement to be defamatory.

**_Defamatory Statement._** A statement is defamatory if it tends to harm the reputation of another such that third persons may be deterred from associating or dealing with her.  *SG Interests I, Ltd. v. Kolbenschlag*, 452 P.3d 1, 6 (Colo. App. 2019) (citing *Sky Fin 1 v. Schuttloffel*, 27 P.3d 361, 369 n.3 (Colo. 2001)).  A finding that the language used was actually defamatory must be predicated on the context, including consideration of the

---

[21] Defendant counters in part that IMLCC "leadership has been defending their bad decisions and poor management by defaming Counterclaimant with blame and false facts ongoing," and its "lawsuit is libel and has destroyed [her] business." [#20 at 8].  Insofar as Defendant argues that Plaintiff's Complaint may be actionable defamation, this proposition has been soundly rejected by the courts. *See, e.g., Begley & Hirsch Revocable Trust v. Ireson*,--- P.3d ----, 2020 COA 157, 2020 WL 6495076, at *3–4 (Colo. App. 2020) (discussing absolute litigation privilege applicable to defamatory statements made in the course of legal proceedings so long as the statements and proceedings are related) (citing *Westfield Dev. Co. v. Rifle Inv. Assocs.*, 786 P.2d 1112, 1117 (Colo. 1990)).  As such, any defamation claim presently asserted by Ms. Bowling and predicated on the instant lawsuit is not actionable as a matter of law.

"entire story" and the common meaning of the words used. *Tonnessen v. Denver Pub. Co.*, 5 P.3d 959, 965 (Colo. App. 2000).

Taken as true, Ms. Bowling's allegations show that Mr. Smith's statement would likely deter others from conducting business with her.  This is particularly true in light of the statement's temporal context and its publication to Ms. Bowling's business associates.  Mr. Smith's email was sent on June 20, 2020—less than two weeks prior to the contract's expiration date.  Ms. Bowling alleges that the implied "abruptness" of her departure made her appear "reckless and untrustworthy," [#11 at ¶ 41], because as the individual in "total control over operations and technology," [*id.* at ¶ 34], the IMLCC would face "serious hardships" in her absence [*id.* at 24].  Thus, construing the Counterclaim in a light most favorable to Ms. Bowling, I cannot conclude that Mr. Smith's statements were incapable of a defamatory meaning or effect as a matter of law.  *See C.G. v. City of Fort Lupton*, No. 13–CV–01053–REB–CBS, 2014 WL 2597165, at *14–15 (D. Colo. June 10, 2014) (denying motion to dismiss Colorado defamation claim on a Rule 12(b)(6) motion)).

*Truth.* The IMLCC also argues for dismissal based on the premise that Ms. Bowling has failed to plead that the statement was not materially false, and argues in the alternative that the statement was substantially true.  Case law is somewhat unclear whether a plaintiff must prove the falsity of the alleged defamatory statement involving a matter of <u>private concern</u>, or whether the burden of proving the truth of the statement is borne by the defendant. *See McIntyre v. Jones*, 194 P.3d 519, 528 (Colo. App. 2008) (citing *Gordon v. Boyles*, 99 P.3d 75, 81 (Colo. App. 2004)). Generally, truth is an affirmative defense available to a defendant in a defamation case, and, therefore, it is not the plaintiff's initial burden to show that the statement is false. *See Churchey v. Adolph*

50

*Coors Co.,* 759 P.2d 1336 (Colo. 1988); *Gomba v. McLaughlin*, 504 P.2d 337 (Colo. 1972).  Given the absence of any meaningful briefing of this issue by the Parties, I find consideration of this issue better suited for another day and more robust briefing and thus decline to recommend dismissal on this basis.

"Substantial truth, not absolute or literal truth, is the standard for the affirmative defense of truth to a defamation claim—'it is sufficient if the substance, the gist, the sting, of the matter is true.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.,* 861 F.3d 1081, 1110–11 (10th Cir. 2017); *see also Beyer Laser Ctr., LLC v. Polomsky*, No. 16-cv-03099-MEH, 2019 WL 5549160, at *5 (D. Colo. Oct. 25, 2019). Substantial truth is a complete defense to defamation. *Gordon*, 99 P.3d at 81. The question is whether "there is a substantial difference between the allegedly libelous statement and the truth," *Gomba*, 504 P.2d at 339, and focuses on whether "'the challenged statement produces a different effect upon the average reader than that which would be produced by the literal truth of the matter,'" *Kolbenschlag*, 452 P.3d at 6 (quoting *Fry v. Lee*, 408 P.3d 843, 849 (Colo. App. 2013)) (internal brackets omitted).

"Dismissing a claim under Rule 12(b)(6) on the basis of an affirmative defense is only proper where that defense is clear from the face of the complaint." *Allen v. Colo. Dep't of Corr.*, No. 20-cv-00226-WJM-KLM, 2020 WL 8408479, at *3 (D. Colo. Sept. 17, 2020) (citations omitted); *see also Cosgrove v. Kan. Dept. of Soc. & Rehab. Serv.*, 332 F. App'x 463, 467 (10th Cir. 2009) ("[T]he statute of limitations is an affirmative defense, and to dismiss a claim pursuant to Rule 12(b)(6) on this basis it must be clear from the face of the complaint that the claims are time-barred."); *Dummar v. Lummis*, 543 F.3d 614, 619 (10th Cir. 2008) (an affirmative defense may be resolved on a motion to dismiss

where the application of the defense is apparent from the face of the complaint).  Thus, the question here is whether Plaintiff's "substantial truth" affirmative defense appears on the face of the Counterclaim.

Plaintiff argues that the substantial truth inquiry should encompass only the "material statement" by Mr. Smith "that the contract terminated or expired." [#17-1 at 15]. This court respectfully disagrees. It is one thing to simply state that a pivotal player's contract will terminate or expire.  It is quite another thing to distribute an organization-wide email stating that, in the eleventh hour, the same pivotal player intentionally rejected an offer to continue serving the organization.

Ms. Bowling's defamation claim for libel is premised on a letter sent by Mr. Smith to the entire Commission on June 20, 2020, wherein Mr. Smith stated that Ms. Bowling's last day with the IMLCC would be June 30, 2020 because she had "willfully declined to renew her contract." [#11 at ¶ 41].  According to Ms. Bowling, however, she did no such thing.  Instead, after Mr. Smith offered her a two-month extension, the IMLCC's Personnel Committee instructed her to "wait for their . . . solution." [#11 at 23]. "It was while [she was] waiting for their solution" that Mr. Smith sent his email announcing, "falsely[,] that Ms. Bowling declined to renew her contract." [*Id.*].  To be sure, had Mr. Smith simply stated that Ms. Bowling's contract would terminate or expire on June 30, 2020, his statement would be substantially true.  But that's not what he did.  Instead, ten days prior to the contract's expiration date, he affirmatively stated that this would happen because she had "willfully declined" to renew her contract, thereby placing blame for the abrupt departure on Ms. Bowling exclusively. Yet Ms. Bowling claims she never declined an offer to renew her contract—let alone willfully—and was simply waiting for a forthcoming offer

of employment promised by the Personnel Committee.

Accordingly, this court cannot conclude, as a matter of law, that the statements in Mr. Smith's email (as opposed to additional details about the Parties' contract renewal negotiations) would not "have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Brokers' Choice of Am.*, 138 F. Supp. 3d at 1199 (quoting *Air Wisc. Airlines Corp. v. Hoeper*, 571 U.S. 237, 134 S. Ct. 852, 861, 187 L. Ed. 2d 744 (2014)).

Because I find that Ms. Bowling has plausibly alleged a claim for libel premised on Mr. Smith's defamatory statements, I respectfully **RECOMMEND** that Plaintiff's Motion to Dismiss be **DENIED** insofar as it seeks dismissal of Counterclaim IV.

I.      **Intentional Infliction of Emotional Distress (Counterclaim V)**

Plaintiff does not raise any arguments expressly directed at Defendant's fifth counterclaim. *See generally* [#17-1].    Rather, Plaintiff argues for dismissal of Counterclaims I through IV and appears to implicitly rely on these arguments proving successful to warrant dismissal of Ms. Bowling's intentional infliction of emotional distress (or "IIED") claim, which is premised on the same facts alleged in Counterclaims II through IV.   But the dismissal of Defendant's first four counterclaims would not necessarily preclude her IIED claim.

In Colorado, a claimant may recover damages for severe emotional distress without any accompanying physical injury. *Rugg v. McCarty*, 476 P.2d 753, 756 (1970) (adopting the approach to IIED set out in the Restatement (Second) of Torts § 46). To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show that "(1) the defendant engaged in extreme and outrageous conduct; (2) recklessly or with the

intent of causing the plaintiff severe emotional distress; (3) causing the plaintiff to suffer severe emotional distress." *Han Ye Lee v. Colo. Times, Inc.*, 222 P.3d 957, 966–67 (Colo. App. 2009).

Plaintiff fails to challenge the sufficiency of the Counterclaim with respect to any element of Ms. Bowling's IIED claim.  Accordingly, in the absence of any additional argument by Plaintiff to support dismissal of Counterclaim V, this court respectfully **RECOMMENDS** that Plaintiff's Motion to Dismiss be **DENIED** as to Counterclaim V.

## CONCLUSION

Based on the foregoing considerations, **IT IS ORDERED** that:

(1)     Defendant's Motion to Clarify [#28] is **GRANTED**;

(2)     The undersigned's March 12, 2021 Recommendation and Order [#24] is **WITHDRAWN**; and

(3)     Plaintiff's Motion to Strike [#21] is **DENIED**.

Additionally, I respectfully **RECOMMEND** that:

(1)     Defendant's Motion to Dismiss [#7] be **DENIED**;

(2)     Plaintiff's Motion to Dismiss [#17] be **GRANTED IN PART and DENIED IN PART**; and

(3)     Counterclaims I and III of Defendant's Counterclaim [#11] be **DISMISSED without prejudice**.[22]

---

[22] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may

DATED: June 23, 2021                    BY THE COURT:

                                        Nina Y. Wang
                                        United States Magistrate Judge

---

bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyoming Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).